

# NUMBER 13-09-00204-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

PETROLEUM SOLUTIONS, INC.,                                    Appellant,

v.

BILL HEAD D/B/A BILL HEAD ENTERPRISES
AND TITLEFLEX CORPORATION,                                    Appellees.

## On appeal from the 398th District Court
## of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Vela
### Memorandum Opinion by Chief Justice Valdez

This appeal pertains to a substantial leak of diesel fuel from an underground storage system located at the Silver Spur Truck Stop in Pharr, Texas. By thirteen issues, appellant, Petroleum Solutions, Inc. ("PSI"), challenges the jury's verdict in favor of appellees, Bill Head d/b/a Bill Head Enterprises ("Head") and Titeflex, Inc., and sanctions issued by the trial court, which included the assessment of costs against PSI,

the striking of PSI's affirmative defenses, and a jury instruction that PSI destroyed, lost, or failed to produce material evidence, namely a flex connector that PSI asserted was the cause of the underlying leak. PSI further argues that: (1) it is entitled to judgment on Head's breach of fiduciary duty, fraud, breach of contract, breach of warranty, and negligence claims; (2) it is entitled to judgment on Titeflex's indemnity claims; (3) the trial court erred in failing to properly instruct the jury on overlapping damages; (4) Head is not entitled to attorney's fees or pre-judgment interest; (5) the judgment improperly disregarded the jury's proportionate responsibility finding; and (6) it is entitled to judgment on its claims against Head for payment to clean-up of the leak. We affirm, in part, and reverse and remand, in part.

## I.    BACKGROUND

Head began his career as a truck driver and eventually began acquiring trucks to establish a trucking business. At the same time, he worked part-time for a truck broker in Edinburg, Texas. Head desired to open his own trucking brokerage and truck stop. In 1991, Head purchased what was once known as The Tapadera, which is located in Pharr, Texas.[1] Head renamed the facility the Silver Spur Truck Stop. The facility included nineteen acres of land, a restaurant, an office, and three steel underground tanks and fuel dispensers. In 1996, Head added a motel to the truck stop. The facility was operated as a truck stop and as a brokerage center for trucks shipping products between Mexico and the United States.

## A. PSI's Installation of a New Underground Storage Tank System

---

[1] The land upon which The Tapadera was situated had been previously contaminated by a fuel leak, but the State had contracted with companies to clean up the leak. Head testified that when he purchased the property, the prior contamination had been remediated.

2

Shortly after purchasing the property, Head discovered that one of the steel underground tanks failed a required tightness test, which resulted in it being removed from service. Later, the Texas legislature passed a new law requiring that steel underground storage tanks be replaced or modified to protect against leaks. In response to the new law, in 1996, Head contracted with PSI to install a new fiberglass underground storage tank system. Head selected PSI to do the work because PSI was local and he had heard good things about the company. In fact, PSI is exclusively engaged in the business of installing, repairing, maintaining, and removing underground-storage-tank systems and compliance issues related to those systems, and as Mark Barron, the president of PSI and Environmental Risk Management ("ERM"), testified, PSI is a leader in this industry.

PSI's proposal to Head included the removal of the three steel tanks and the installation of two twenty-thousand-gallon, double-walled fiberglass tanks to be used to store diesel fuel. Though State regulations did not require that the tanks be double-walled, Head agreed to PSI's proposal and work began. Acting on Head's behalf, PSI filed a construction application with the Texas Natural Resource Conservation Commission (the "TNRCC"), now known as the Texas Commission on Environmental Quality. After receiving approvals from the TNRCC, PSI removed the old steel tanks and installed the new fiberglass tanks in a different area from where the steel tanks were previously installed. Barron testified that:

> First off, we installed the new underground storage tanks those two 20,000-gallon storage tanks. We then probably took their system out of service because we had to build new trenches to the existing dispensers to run new piping, which we did, and after we dug the tanks or installed the tanks, dug the trenches, installed the piping, modified the existing electrical to run to the new system, hook up the existing pumps that we

3

moved from their old system to the new tanks, hooked all that up, backfilled, powered concrete, checked everything out, did testing on the tanks and the lines as it's required, started to open business, then we moved the old system. That's the whole project, basically.

PSI completed construction on the new system in 1997.

## B. PSI's Installation of a New Release Detection System

According to Bill Morris, an inspector for PSI and a previous employee of the TNRCC, on December 22, 1998, the State enacted new regulations requiring improved release detection methods. Among the methods approved for usage by the State was an automatic tank gauging system ("ATG"), which reconciles fuel lost and added to the storage tanks to determine if a release has occurred.[2] At the time, Head was using the stick method, gauging fuel in the underground storage tanks using long, calibrated measuring sticks. In response to the new regulation, PSI recommended that Head install a new ATG system. PSI told Head that the ATG system "was supposed to do all the work and should—should alert us whenever we had a leak." Further, based on the advice of PSI, Head agreed to the installation of the ATG system. PSI completed the installation of the ATG system in October 1999. Because of the ATG system, Head discontinued using the stick method to monitor inventory levels.

## C. Problems With the Release Detection System

Shortly after PSI installed the underground storage tank and ATG systems, Head began to experience many problems. Between 1997 and 2001, Head requested that

---

[2] The December 22, 1998 regulation also allowed operators to utilize a soil-vapor monitor or a statistical-inventory reconciliation; however, Robert Carpenter, the manager of the Silver Spur Truck Stop, testified that PSI only recommended the ATG system. Carpenter explained that PSI told him that the ATG system "was supposed to be leaps and bounds over what they expected us to do [using the stick method]. It was kind of a computerized piece of equipment." Carpenter noted that the ATG system was designed to be more accurate than the stick method. Morris later testified that PSI sold and installed ATG systems, yet it did not do soil-vapor monitoring or statistical-inventory reconciliation.

PSI maintain and/or repair the system numerous times.[3] Head testified that PSI's systems caused him more problems than his old system and that PSI serviced the systems on a "[p]retty regular [basis]." Head recalled that the ATG system was usually the reason for the problems. Head authorized Robert Carpenter, the manager of the Silver Spur Truck Stop, to contact PSI whenever a problem arose with the systems. Carpenter recalled that PSI was the exclusive entity that maintained and repaired the systems.

In late October 2001, Carpenter went on vacation. When he returned in early November 2001, Carpenter discovered additional problems with the underground storage tanks. Gilbert Obregon, a clerk at the Silver Spur Truck Stop, testified that, when reconciled each month, the ATG system always revealed an overage or shortage with respect to the amount of diesel fuel purchased and the amount of fuel in the storage tanks. Oddly, at the end of October, Obregon noticed that the ATG system reconciled 100 percent. Nevertheless, while Carpenter was on vacation, the inventory numbers became more volatile. Carpenter described the volatility as such:

> The numbers of the inventory didn't match up, but it was taken off the ATG. They were bouncing back and forth within the time I was gone. One day we would have a minus fuel, and the next day a plus fuel, which would balance out, but as time progressed on, these numbers—it became evident that there was a potential problem on hand.[4]

As a result of his observations, Carpenter notified PSI. Head allowed PSI to investigate the systems to determine the extent and source of the perceived problem.

---

[3] The record reflects that between 1997 and 2001, PSI invoiced Head at least fifty times for service calls on the systems that PSI installed at the Silver Spur Truck Stop.

[4] PSI alleged at trial that the volatility could be explained as bad inventory-control accounting on the part of Head. Sullivan Curran, one of Head's expert witnesses, noted that even if PSI was correct in asserting that Head's inventory control records were bad, the ATG system failures made it very difficult for Head to discover the leak.

5

## D. The Leaking of Diesel Fuel

In the course of its investigation, PSI discovered that a major release of diesel fuel had occurred. Experts estimated that more than 20,000 gallons of diesel fuel was recovered from underground. Barron acknowledged that the fuel had leaked "quite aways [sic]" from the Silver Spur Truck Stop, including a drainage ditch that bordered the property and that he had "no idea how much [diesel fuel] they lost."[5] Carpenter denied seeing any diesel fuel on the asphalt surrounding the truck stop; however, one of Head's expert witnesses, Daniel Airey, an environmental consultant for Ranger Environmental Services ("Ranger"), stated that, based on a monitor well Ranger implemented on the northern side of the truck stop, diesel fuel leaked from 5.78 feet to 19.95 feet underground. Airey further noted that diesel fuel had leaked into the water table, which is located at 18.82 feet underground where the monitor well was placed. Upon discovering that a major leak had occurred, Barron traveled to the scene. Barron admitted that when he was told about the leak, he anticipated that PSI would be sued because PSI had installed the underground storage tank and ATG systems.

## E. PSI's Determination of the Source of the Leak

Several PSI employees investigated the underground storage tank system to determine the cause of the leak.[6] PSI examined the double-walled fiberglass tanks, the system's piping, and the dispensers. Barron testified that the tanks were subjected to

---

[5] In a mandatory "Release Determination Report Form" prepared by PSI on December 11, 2001, PSI informed the TNRCC that: "Diesel noted in observation wells and in drainage ditch located in proximity to facility." PSI also noted that the soil and an irrigation drainage ditch were impacted.

[6] Among those who arrived at the truck stop once the leak was discovered was Morris. Morris testified that he went to the truck stop on his own volition and that he subsequently assisted Obregon in creating inventory records to submit to the TNRCC. Obregon testified that Morris instructed him to round off inventory figures before reporting the information to the TNRCC. Other witnesses stated that Morris told Obregon to alter inventory entries for the months preceding the leak to reflect gross figures rather than net figures. Head's experts opined that these figures were altered to minimize PSI's fault with respect to the leak and to show that Head was not diligent in discovering the leak.

6

two pressurized leak tests, both of which they passed. PSI then tried to test the system's piping, but PSI could not "establish pressure on the piping." Based on the inability of the system's piping to establish pressure, PSI concluded that the leak must be located somewhere within the piping system.

Later, Barron approached Carpenter and informed him that the source of the leak was a faulty flex connector located under "Dispenser Number 4." Barron showed Carpenter the alleged faulty flex connector and allegedly told Carpenter the following: "I'm the vendor, I would like to take this part over to our location to our office and keep it for safekeeping and maybe testing at a later time." Carpenter allowed Barron to take the allegedly faulty flex connector because he "didn't really have a place to store it." That was the last time Carpenter or Head ever saw the flex connector. At trial, Barron testified that he created handwritten notes about the allegedly faulty flex connector when it was removed. He specifically recalled that the flex connector was manufactured by Titeflex; however, when asked whether he still had his notes from that day, Barron stated: "I don't have the notes stating it [the flex connector] was actually Titeflex, no, sir." Photographs of the alleged faulty flex connector were admitted at trial, and Barron admitted that none of the photographs indicated that the flex connector was indeed manufactured by Titeflex. The flex connector was never produced by PSI; instead, Barron asserted that PSI's attorneys took the flex connector and then submitted the flex connector to PSI's expert, David Hendrix. Once Head filed suit, Hendrix was unable to find the flex connector.

In any event, PSI and ERM filed documents with the TNRCC on Head's behalf.[7] In the mandatory December 11, 2001 "Release Determination Report Form" that was prepared, PSI identified the flex connector as the sole source of the leak. PSI noted that the connector was replaced. Further, at the time the report was generated, PSI revealed that 14,843 gallons of diesel fuel had been recovered from the "tank cavity" and that 32,000 gallons of "water/diesel/mix" had been extracted from drainage ditches. Barron signed the report certifying that PSI was supervising all site investigation and repair activities in accordance with accepted industry standards.

In addition to the TNRCC report, Morris created a chronology of the leak for the benefit of Barron.[8] In his chronology, Morris noted that, among other things, on November 19, 2001, "[t]he source of the release has now been determined to be from the flex connector at dispenser #4. Both diesel tanks were tightness tested and passed." Morris's chronology was submitted as an attachment to the "Release Determination Report Form."

## F. The TNRCC's Response

While PSI was examining the underground storage tank system to determine the cause of the leak, Head contracted with Barron's other company, ERM, to begin the cleanup effort. Representatives of ERM informed the TNRCC of the release, and the TNRCC sent Boots & Coots, a company specializing in the cleanup of fuel spills, to

---

[7] At trial, Barron acknowledged that he is president of both PSI and ERM. Moreover, Barron testified that ERM is a publically-traded company and that PSI owns 75% of ERM's stock. On cross-examination, Barron admitted that PSI ostensibly controls the business of ERM.

[8] Barron admitted at trial that much of the information contained in Morris's chronology was based on information Barron had told Morris about the leak and the subsequent cleanup.

8

assist.[9] Carpenter stated at trial that he was present during the cleanup; that ERM appeared to lead the cleanup efforts; and that Boots & Coots employees reported to ERM. Shortly thereafter, the fire marshal and other companies specializing in remediation arrived at the scene to also assist in the cleanup. In addition to Boots & Coots, the TNRCC sent a representative, Paul Cordova, to investigate the leak.[10] As part of his investigation, Cordova was required to determine the cause of the leak. Cordova testified that the flex connector was the cause of the leak though he admitted to never having seen the flex connector; instead, Cordova relied solely on Barron's statements regarding the cause of the leak. Cordova also requested monthly inventory records for the truck stop, though Head was only able to quickly produce records for a couple months. Cordova testified that PSI provided most of the information about the truck stop to the TNRCC and that it appeared as if PSI was Head's representative.

Based on his investigation of the truck stop's inventory records and the statements made by PSI, Cordova issued numerous citations to Head, with some of the violations not pertaining to the discharge of diesel fuel.[11] The citations amounted to over $300,000 in fines assessed against Head; however, after negotiating with the TNRCC and demonstrating compliance with numerous regulatory provisions, Head was able to reduce the fines to approximately $30,000, with half of the fines paid to a charity

---

[9] The record reflects that Boots & Coots performed work at the truck stop from November 8, 2001 to November 9, 2001, removing diesel fuel that had spilled into two drainage canals and irrigation canals that were in close proximity to the truck stop and implementing "boons" to absorb and stop the migration of hydrocarbons. Boots & Coots charged Head $16,178.03 for their services. Head's expert, Daniel Airey, testified it was a reasonable charge for the services provided.

[10] It was established at trial that Morris used to work for the TNRCC and had trained Cordova to be a TNRCC investigator.

[11] Among the citations issued to Head was for failing to correctly label each underground storage tank, which several witnesses testified was PSI's responsibility.

9

in the Rio Grande Valley that "dealt with providing water and sewer services to poor communities." Nevertheless, at the time of trial, Head still operated under a TNRCC enforcement order.[12]

## G. Remediation of the Leak

Through remediation efforts, approximately 22,000 gallons of diesel fuel were recovered from underground, drainage ditches, and other places. In addition, more than 39,000 gallons of groundwater was extracted because the water contained traces of diesel fuel. However, the remediation of the site was an ongoing endeavor. In December 2005, more than four years after the initial leak, Head hired Ranger Environmental Services ("Ranger") to conduct a compliance audit and to ensure that Head's paperwork regarding fuel inventory levels was being done correctly. At this time, Ranger was not performing any remediation work for Head. Instead, Ranger checked various monitors to ensure that the remediation efforts were in compliance with TNRCC regulations. Airey was in charge of the audit, and when he checked the monitors, he noticed that there was "[a] lot of diesel fuel in the ground." Airey found that there was still about 10.5 feet of diesel fuel on the groundwater table. Airey testified that ERM and PSI were responsible for cleaning up the released diesel fuel at this time.

Upon Airey's discovery, Head hired Ranger to complete the clean-up of the leak. At the time of trial on this matter, in October 2008, the site has not been completely remediated, though the TNRCC remediation order remains in effect. Airey estimated

---

[12] One of Head's attorneys, Donald Grissom, testified that he handled the TNRCC's enforcement action and that Head incurred $42,925 in attorney's fees, plus $2,800 in expenses. Grissom noted that his hourly fee of $250 was reasonable for this service in Travis and Hidalgo counties. Grissom referenced Travis county because several administrative hearings took place in Austin, Texas, which is the county seat of Travis county. *See* Tex. State Hist. Assoc., Austin, TX (Travis County), *available at* http://www.tshaonline.org/handbook/online/articles/hda03 (last visited Mar. 30, 2011). In fact, Grissom acknowledged that about 90% of the work done on the enforcement action took place in Austin.

that the total cost to complete the remediation to the satisfaction of the TRNCC would be $509,509.

**H. Alternative Theories About the Cause of the Leak and Titeflex's Involvement**

Titeflex's expert witness, Bruce W. Pinkston, Ph.D, estimated that the leak first occurred in March 2001, and continued consistently until discovered in November 2001. Dr. Pinkston opined that the leak was slow and probably constituted about five gallons per hour. One of Head's expert witnesses, Sullivan Curran, a consultant and executive director of the Fiberglass Tank and Pump Institute, testified that the cause of the leak was PSI's improper installation of a union at a shear valve, not the flex connector. Relying on the deposition testimony of Octavio Pruneda, a technician for PSI, Curran asserted that PSI improperly cross-threaded the union in question, which caused a small leak in the system.[13] In fact, Pruneda replaced a galvanized union at one of the dispensers after confirming the presence of a leak. Curran also testified that PSI had improperly designed the system using pipes that were too small in diameter for the ATG system to work properly. Curran noted that PSI used two-inch pipes for the system when it should have used three-inch pipes. The system has a high-powered, five-horsepower pump that is used to push fuel from the tanks to the dispensers. Because the pipes were smaller than what industry standards require when integrated with a five-horsepower pump, the fuel pressure in the system was always high and never "dropped below ten PSI [pounds per square inch]" to allow for the ATG system to detect whether there was a leak in the system.

---

[13] Pruneda also noticed that the system had two boots with holes and that there were kinked hoses in the system, which allowed for the fuel pressure to increase. Pruneda testified that the effect of too much pressure would be "the flex hose can go bad. You would have a leak."

Roy Rodriguez, PSI's crew chief during the initial 2001 clean-up of the leak, testified that PSI dug up the system and tested the system's flex hoses, which did not reveal any leaks. Rodriguez denied taking any portion of the system out of the ground for testing. Specifically, Rodriguez did not recall anyone removing a flex connector from the ground in November 2001, and he did not recall Barron being present at the truck stop in November 2001, testing the flex connector, or putting the flex connector in the back of his truck.

Despite these allegations, PSI continually asserted that the flex connector was the cause of the leak. Barron testified that he was present at the truck stop during the initial stages of the investigation and clean-up in November 2001. Barron recalled removing the alleged faulty flex connector and placing it in the back of his truck so that it could be tested. The flex connector was never seen again; however, Barron made handwritten notes, took pictures of the flex connector, and repeatedly testified that the flex connector was manufactured by Titeflex, even though the original system plans did not call for a Titeflex flex connector to be implemented in the system. Furthermore, Barron repeatedly certified to the TNRCC that the cause of the leak was a Titeflex flex connector.

## I. The Lawsuits

On February 13, 2006, Head filed suit against PSI for breach of warranty of fitness, breach of implied warranty of good and workmanlike services, negligence, and fraudulent concealment. Because the lawsuit was filed more than four years after the leak was discovered in November 2001, Head pleaded the discovery rule. On October 5, 2006, PSI filed a third-party action against Titeflex, claiming contribution and

12

indemnity. PSI claimed that Titeflex had manufactured the faulty flex connector that caused the leak and subsequently went missing. PSI's contribution claim was premised on a strict liability cause of action, and PSI claimed that all damages that Head may have sustained were attributable to the alleged faulty flex connector. Based on the allegations made by PSI in its third-party action, Head amended his original petition to include Titeflex as a defendant. Head specifically noted that "Titeflex is strictly liable for damages caused by the defective flex connector." Shortly thereafter, Titeflex answered both PSI and Head's third-party actions and asserted various affirmative defenses.

In the meantime, PSI filed a counterclaim against Head on March 20, 2007, asserting that Head had breached numerous agreements by failing to pay PSI $57,527.49 for work and materials provided to the truck stop.[14] Later, Titeflex filed a motion for summary judgment, urging that there was no evidence that the flex connector that PSI asserted was the cause of the leak had been manufactured by Titeflex. Essentially, Titeflex argued that there was no evidence whatsoever to show that it was at fault for the leak. The trial court set a date for the hearing on Titeflex's motion for summary judgment; however, because both Head and PSI argued that they needed more time to conduct discovery, especially considering that the alleged faulty flex connector could not be found, the trial court continued the hearing.[15]

In its designation of expert witnesses filed on August 20, 2007, PSI identified one expert, Bastiaan E. Cornelissen, Ph.D, P.E., to opine that all the damages sustained as a result of the leak were attributable to the alleged faulty flex connector. However, after

---

[14] Head acknowledged that PSI had submitted invoices for the amount requested in its counterclaim; however, Head refused to pay the invoices because he believed that PSI was at fault for causing the leak.

[15] Ultimately, Titeflex's motion for summary judgment was denied by the trial court.

13

several notices were provided, Dr. Cornelissen never showed up for his deposition. Nevertheless, PSI continued to blame the leak on the flex connector that was purportedly manufactured by Titeflex.

On January 4, 2008, Titeflex filed a motion for sanctions, alleging that PSI had spoliated evidence by failing to produce the alleged faulty flex connector. In its motion, Titeflex referenced deposition testimony provided by Barron, whereby he admitted that PSI tested several flex connectors incorporated into the system, removed the alleged faulty flex connector, and subsequently lost the allegedly faulty flex connector, thus making it impossible to determine if the flex connector was defective and whether Titeflex had indeed manufactured the part. Titeflex sought to exclude all evidence tending to show that any product manufactured or sold by Titeflex was defective, and it requested an instruction to the jury on spoliation. Head also filed a motion for sanctions against PSI, arguing that PSI had intentionally destroyed crucial evidence, i.e., the alleged faulty flex connector. Head requested that the trial court consider the full range of sanctions, up to and including the striking of PSI's pleadings and rendering a default judgment.

PSI responded to both Titeflex and Head's motions for sanctions by blaming Head's delay in bringing suit and PSI's engineering consulting firm and lab for the loss of the flex connector.[16] PSI argued that it had made numerous efforts to recover the flex connector, even though more than six years had elapsed since the flex connector

---

[16] In support of its contentions in its response to Titeflex and Head's motions for sanctions, PSI included the affidavit of Elizabeth Neally, an attorney who previously worked on this case, who averred that she took possession of the flex connector from Barron on or about February 2002. She then sent the flex connector to David Hendrix, one of PSI's consulting experts, "to perform a non-evasive examination of the flex connector[,] the subject of this suit." In September 2002, Neally received an invoice from Hendrix regarding the examination of the flex connector; however, Hendrix apparently never returned the flex connector to Neally, nor did he respond to PSI's requests for the return of the flex connector.

was allegedly removed from Head's underground storage tank system. PSI further argued that it did not deliberately destroy evidence; that it had not engaged in culpable or negligent conduct with respect to the flex connector; and that it did not have a duty to keep the flex connector once the limitations period expired. As a result, PSI did not believe that sanctions or a spoliation instruction was warranted.

While Titeflex's motion for summary judgment and the motions for sanctions were pending, Head non-suited all his claims against Titeflex on March 7, 2008, based on the lack of evidence demonstrating that Titeflex had manufactured the flex connector that PSI contended was the cause of the leak. PSI, however, continued to maintain its indemnity claims against Titeflex. PSI later filed its first amended answer, defenses, and cross-claim. In this filing, PSI generally denied all of Head's claims; argued that Head was contributorily negligent in causing the leak; designated Titeflex, among others, as responsible third parties under chapter 82 of the civil practice and remedies code, *see* TEX. CIV. PRAC. & REM. CODE ANN. §§ 82.001-.008 (West 2011); and asserted various affirmative defenses, including statute of limitations.

In response, Titeflex filed a counterclaim against PSI, contending that it owed PSI no duty to indemnify. Titeflex further contended that PSI was an assembler of a finished product and that Titeflex was an innocent seller under chapter 82 of the civil practice and remedies code, *see id.*; thus, PSI was obligated to indemnify Titeflex for "all past and future costs of court, reasonable expenses, and reasonable and necessary attorney's fees which were expended in defense of this action and in prosecution of this demand for indemnity." Titeflex also argued that there was no evidence indicating that

15

a Titeflex flex connector was used in Head's underground storage tank system. Titeflex also re-urged its request for sanctions against PSI.

Head, meanwhile, amended his petition several times. In his sixth amended petition, his live pleading, Head asserted claims against PSI for breach of implied warranty of good and workmanlike services, negligence, fraud, breach of fiduciary duty, fraudulent concealment, and breach of contract. Head also alleged that PSI was strictly liable for the defective ATG system, which "did not work at the system's required capacity." Head requested damages for: (1) remediation; (2) TNRCC fines and penalties; (3) lost revenues as a result of the lines being shut down due to system failures; (4) the cost of replacing the failed system; and (5) the cost of replacing the 20,000 gallons of lost diesel fuel at $1.50 per gallon. In addition, Head asked for attorney's fees and uncapped punitive damages against PSI for allegedly "us[ing] workers who were not qualified for [the] work that was performed, regularly falsif[ying] work description sheets and intentionally cover[ing] up the real causes of the leak and resulting damages." Head further alleged that PSI violated section 32.46 of the Texas Penal Code for securing the execution of documents by deception. *See* TEX. PENAL CODE ANN. § 32.46 (West Supp. 2010). With respect to section 32.46 of the penal code, Head argued that PSI: (1) induced Carpenter to sign documents that were sent to the TNRCC, which falsely stated that the flex connector was the sole cause of the leak; and (2) withheld documents and evidence from the TNRCC and Head to cover up the true causes of the leak. In response to PSI's limitations defense, Head asserted that his causes of action were tolled by the discovery rule.

16

On August 12, 2008, PSI non-suited its claims against Titeflex. However, Titeflex continued to seek costs associated with the matter pursuant to Texas Rule of Civil Procedure 162. *See* TEX. R. CIV. P. 162. Shortly before trial commenced, the trial court conducted a hearing on the pending motions for sanctions. After hearing arguments from all parties, the trial court struck PSI's affirmative defenses, including its limitations defense, and ruled that a spoliation instruction would be given to the jury. The parties' request for attorney's fees was carried to the end of the trial. The trial court also denied various motions that PSI had filed, including a motion to strike Head's third, fourth, fifth, and sixth amended petitions, and a motion to dismiss or sever Titeflex's counterclaims.

In October 2008, this matter proceeded to trial, which ultimately lasted for seven weeks. At the conclusion of the evidence, the jury found in favor of Head and Titeflex. In particular, the jury ruled in favor of Head's negligence, breach of contract, fraud, breach of warranty, and breach of fiduciary duty claims.[17] With respect to Titeflex, the jury concluded that PSI was a manufacturer; that Titeflex was an innocent seller within the context of chapter 82 of the civil practice and remedies code; and that Titeflex was entitled to indemnity from PSI, thus allowing for the recovery of costs, expenses, and attorney's fees associated with the trial of this matter. Head elected to recover on the theories of breach of contract, breach of implied warranty, fraud, and breach of fiduciary duty. Head was awarded: (1) $818,142.38 in actual damages and $283,178.88 in pre-judgment interest for a sum total of $1,131,321.26; and (2) $91,500 in attorney's fees. Titeflex was awarded: (1) $382,334 in attorney's fees and $68,519.62 in expenses for a sum total of $450,853.62; and (2) $12,393.55 in court costs. The jury also concluded

---

[17] Regarding Head's negligence claim, the jury apportioned PSI's fault at 75%, with the remaining 25% apportioned to Head.

17

that Head breached agreements with PSI for materials and services provided for the clean-up of the truck stop; however, according to the jury, Head was excused from complying with the agreements.[18]

The trial court signed the final judgment based on the jury's findings on January 13, 2009. Various post-judgment motions were filed, including motions for judgment non-obstante verdicto, to disregard the jury's findings, for a new trial, to modify the judgment, and for remittitur. Each of these motions was denied by the trial court. PSI timely filed its notice of appeal on April 9, 2009. *See* TEX. R. APP. P. 26.1(a). On April 28, 2009, PSI filed a supersedeas bond in the registry of the trial court in the amount of $1,037,737, or fifty percent of PSI's net worth as expressed by Barron.[19] *See id.* at R. 24.2(a)(1)(A); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 52.006(b)(1) (West 2008). This appeal followed.

## II. THE TRIAL COURT'S SANCTIONS

By its first issue, PSI challenges the trial court's imposition of sanctions. PSI characterizes the trial court's sanctions as death penalty sanctions and specifically argues that they violate the test set forth in *Transamerican Natural Gas Corporation v. Powell*, 811 S.W.2d 913 (Tex. 1991). PSI contends that there is no relationship between the conduct, the offender, and the sanction and that the sanctions were excessive. Head responds that the trial court's sanctions do not violate the

---

[18] Despite concluding that Head was excused from complying with his agreements with PSI, the jury determined that PSI was entitled to $57,527.49 in compensation from Head.

[19] In an affidavit supporting the filing of a supersedeas bond on behalf of PSI, Barron averred that PSI has $13,200,367.27 in assets and $11,124,894.83 in liabilities and capital; thus, PSI's net worth is $2,075,472.44. Half of PSI's net worth equals approximately $1,037,737.

*Transamerican* standard because there is a relationship between PSI's conduct and the sanction imposed and because the sanctions were not excessive.

Specific as to the trial court's spoliation instruction, PSI argues that it had no duty to retain the flex connector longer than the applicable limitations period; that the loss of the flex connector did not cause any prejudice; and that the instruction "nudged the jury against PSI." Head counters by arguing that PSI had a duty to preserve the flex connector because PSI knew that a lawsuit would likely arise from the incident and that the flex connector was a key piece of evidence. He asserts that PSI's failure to preserve the flex connector prejudiced Head "because he was unable to determine with certainty liability, causation[,] and fault."

## A. Standard of Review and Applicable Law

We review a trial court's imposition of sanctions under an abuse of discretion standard. *Cire v. Cummings*, 134 S.W.3d 835, 838 (Tex. 2004). A trial court abuses its discretion when its ruling is arbitrary and unreasonable and without reference to any guiding rules and principles. *Id.* at 838-39. In conducting our review, we are not limited to a review of the "sufficiency of the evidence" to support the trial court's findings; rather, we make an independent inquiry of the entire record to determine if the trial court abused its discretion by imposing the sanction. *Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 234 (Tex. App.–Houston [1st Dist.] 1998, pet. denied) (op. on reh'g). Thus, we are not limited to considering only the specific violation committed; we may consider other matters that have occurred during the litigation. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241 (Tex. 1985); *see Hartford Acc. & Indem. Co. v. Abascal*, 831 S.W.2d 559, 561 (Tex. App.–San Antonio 1992, orig. proceeding).

19

Rule of civil procedure 215.2 allows a trial court to enter "just" sanctions for a party's failure to comply with a discovery order or request. TEX. R. CIV. P. 215.2; *see Cire*, 134 S.W.3d at 839; *Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 660 (Tex. App.–Dallas 2002, no pet.). Among the prescribed sanctions contained in rule 215.2 are: (1) an order charging expenses for discovery and court costs; and (2) the striking of pleadings and defenses. TEX. R. CIV. P. 215.2(b)(2), (b)(4)-(5). Any sanction that adjudicates a claim or precludes the presentation of the merits of the case constitutes a "death penalty" sanction. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 845 (Tex. 1992); *see also De Los Santos v. Johnson*, No. 13-07-00502-CV, 2008 Tex. App. LEXIS 6841, at *8 (Tex. App.–Corpus Christi Aug. 28, 2008, pet. denied) (mem. op.); *In re Fina Oil & Chem. Co.*, No. 13-98-00640-CV, 1999 Tex. App. LEXIS 1751, at **36-37 (Tex. App.–Corpus Christi Mar. 11, 1999, orig. proceeding) (not designated for publication) (noting that the striking of a party's affirmative defense as a sanction precludes the defendant from going to trial on the merits of that defense and, thus, should be tested according to the standards applied to the striking of any other pleading).

The Supreme Court of Texas in *Transamerican* developed a two-part test for courts to apply when determining whether a sanction is "just." 811 S.W.2d at 917. First, there must be a direct nexus among the offensive conduct, the offender, and the sanction imposed. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (citing *Transamerican*, 811 S.W.2d at 917). A "just" sanction must be directed against the abuse and toward remedying the prejudice caused to the innocent party, and the sanction should be visited upon the offender. *Id.*

20

Second, "just" sanctions must not be excessive. *Transamerican*, 811 S.W.2d at 917. That is, a sanction imposed for discovery abuse should be no more severe than necessary to satisfy its legitimate purposes, which includes securing compliance with discovery rules, deterring other litigants from similar misconduct, and punishing violators. *Id.*; *see Spohn Hosp.*, 104 S.W.3d at 882; *Blackmon*, 841 S.W.2d at 849. For this reason, the supreme court requires courts to consider less stringent sanctions and whether such lesser sanctions would fully promote compliance. *Transamerican*, 811 S.W.2d at 917; *see Cire*, 134 S.W.3d at 839; *Spohn Hosp.*, 104 S.W.3d at 882.

Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses, unless a party's hindrance of the discovery process justifies a presumption that the party's claims or defenses lack merit. *Transamerican*, 811 S.W.2d at 918. However, if a party refuses to produce material evidence, despite the imposition of lesser sanctions, the trial court may presume that the asserted claim or defense lacks merit and dispose of it. *Id.* Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or a party's callous disregard for the responsibilities of discovery under the rules. *Id.* (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642-43 (1976) (per curiam)).

A "hearing on the motion for sanctions [is] akin to a nonjury trial," in which "the trial court is the judge of the credibility of the witnesses and of the weight to be given their testimony, since the judge has the opportunity to observe the demeanor of the witnesses on the stand and may believe all, none, or part of the witnesses' testimony." "In determining whether a trial court has abused its discretion [in a sanctions appeal],

21

we are required to view the evidence in the light most favorable to the trial court's action and to indulge every legal presumption in favor of the judgment." *Vaughn v. Tex. Employment Comm'n*, 792 S.W.2d 139, 143 (Tex. App.–Houston [1st Dist.] 1990, no writ) (citing *Parks v. U.S. Home Corp.*, 652 S.W.2d 479, 485 (Tex. App.–Houston [1st Dist.] 1983, writ dism'd)). Further, reasonable "inferences may be drawn from actual facts proved" by the trier of the facts. *Beazley v. McEver*, 238 S.W. 949, 952 (Tex. Civ. App.–Dallas 1922, no writ).

## A. The Trial Court's Spoliation Instruction

"A spoliation instruction is an instruction given to the jury outlining permissible inferences they may make against a party who has lost, altered, or destroyed evidence." *Tex. Elec. Coop. v. Dillard*, 171 S.W.3d 201, 208 (Tex. App.–Tyler 2005, no pet.) (citing *Brewer v. Dowling*, 862 S.W.2d 156, 159 (Tex. App.–Fort Worth 1993, writ denied)). The use of a spoliation instruction is generally limited to two circumstances: (1) the deliberate destruction of relevant evidence; and (2) the failure of a party to produce relevant evidence or to explain its non-production. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003) (citing *Anderson v. Taylor Publ'g Co.*, 13 S.W.3d 56, 61 (Tex. App.–Dallas 2000, pet. denied)).[20] Under the first circumstance, a party who has deliberately destroyed evidence is presumed to have done so because the

---

[20] In *Wal-Mart Stores, Inc. v. Johnson*, the supreme court stated that:

> Evidence may be unavailable for discovery and trial for a variety of reasons. Evidence may be lost, altered or destroyed willfully and in bad faith or it may be lost for reasons completely innocent. Sometimes, lost evidence may be easily replicated, or it may be so marginal that it has little or no effect on the outcome of the case. On other occasions, the loss or destruction of evidence may seriously impair a party's ability to present its case. A trial judge should have discretion to fashion an appropriate remedy to restore the parties to a rough approximation of their positions if all evidence were available. These remedies must generally be fashioned on a case-by-case basis.

106 S.W.3d 718, 721 (Tex. 2003).

22

evidence was unfavorable to its case. *Id.* at 721-22 (citing *Williford Energy Co. v. Submergible Cable Servs., Inc.*, 895 S.W.2d 379, 389-90 (Tex. App.–Amarillo 1994, no writ); *Brewer*, 862 S.W.2d at 159). Under the second circumstance, the presumption arises because the party controlling the missing evidence cannot explain its failure to produce it. *Id.* at 722 (citing *Watson v. Brazos Elec. Power Coop., Inc.*, 918 S.W.2d 639, 643 (Tex. App.–Waco 1996, writ denied)). "The presumption does not apply when documents are merely lost." *Cresthaven Nursing Residence v. Freeman*, 134 S.W.3d 214, 227 (Tex. App.–Amarillo 2003, no pet.) (citing *Williford Energy Co.*, 895 S.W.2d at 389-90); *Brewer*, 862 S.W.2d at 160. A trial court may be guided by the following three factors in determining whether a spoliation presumption is justified: (1) whether there was a duty to preserve evidence; (2) whether the alleged spoliator either negligently or intentionally spoliated evidence; and (3) whether the spoliation prejudiced the nonspoliator's ability to present its case or defense. *Trevino v. Ortega*, 969 S.W.2d 950, 954-55 (Tex. 1998) (Baker, J., concurring)[21]; *Whirlpool Corp. v. Camacho*, 251 S.W.3d 88, 102 (Tex. App.–Corpus Christi 2008), *rev'd on other grounds*, 298 S.W.3d 631 (Tex. 2009).

Before any failure to produce material evidence may be viewed as discovery abuse, the opposing party must establish that the non-producing party had a duty to

---

[21] In *Trevino v. Ortega*, Justice Baker noted that:

> Because parties have a duty to reasonably preserve evidence, it is only logical that they should be held accountable for either negligent or intentional spoliation. While allowing a court to hold a party accountable for negligent as well as intentional spoliation may appear inconsistent with the punitive purpose of remedying spoliation, it is clearly consistent with the evidentiary rationale supporting it because the remedies ameliorate the prejudicial effects resulting from the unavailability of evidence. In essence, it places the burden of the prejudicial effects upon the culpable spoliating party rather than the innocent nonspoliating party.

969 S.W.2d 950, 957 (Tex. 1998) (Baker, J., concurring) (internal citation omitted).

preserve the evidence in question. *Dillard*, 171 S.W.3d at 209 (citing *Johnson*, 106 S.W.3d at 722). There must be a sufficient foundational showing that the party who destroyed the evidence had notice both of the potential claim and of the evidence's potential relevance thereto. *Id.* (citing *Johnson*, 106 S.W.3d at 722). An objective test for anticipation of litigation is whether a reasonable person would conclude from the severity of the accident and other circumstances surrounding it that there was a substantial chance for litigation. *Id.* (citing *Johnson*, 106 S.W.3d at 722). "A party should not be able to subvert the discovery process and the fair administration of justice simply by destroying evidence before a claim is actually filed." *See Trevino*, 969 S.W.2d at 955 (Baker, J., concurring).

In this case, the trial court included the following spoliation instruction in the charge:

> You, the jury, are instructed that Petroleum Solutions, Inc. destroyed, lost, or failed to produce to this Court material evidence that by law should have been produced as evidence for your deliberations. You are further instructed you may, but are not required to presume this evidence is unfavorable to Petroleum Solutions, Inc.

PSI argues that it did not have a duty to preserve evidence *ad infinitum*. Specifically, PSI contends that it did not have to preserve the flex connector past November 2005, the date in which PSI asserts the limitations period expired. PSI's argument, however, is belied by Barron's testimony and Neally's affidavit. In his testimony, Barron stated that the flex connector was the cause of the leak and that it was removed from the underground storage tank system by PSI employees and placed in the back of Barron's pickup truck in November 2001. Moreover, Barron admitted that he anticipated that he would be sued for the leak when he arrived at the scene of the November 2001 incident.

24

Carpenter consented to Barron removing the flex connector from the premises for safekeeping and possible testing. Neally averred that Barron gave the flex connector to her in February 2002. She then sent the flex connector to Hendrix, PSI's expert, for testing. Hendix examined the flex connector and sent PSI a bill for the examination in September 2002. The flex connector was never returned, and PSI alleges that it was unable to contact Hendrix to instruct him to return the flex connector.

Based on Barron and Neally's statements alone, it is clear that since February 2002, PSI failed to preserve the flex connector. Even if we were to accept PSI's argument that it only had a duty to preserve the flex connector until November 2005, the evidence is clear that PSI had not done so since turning the flex connector over to one of its agents, Neally, in February 2002. Moreover, although PSI argues that the flex connector was lost, a reasonable person could conclude that PSI failed to preserve the evidence given the fact that Hendrix conducted an examination of the flex connector and demanded payment for the examination, yet failed to preserve the evidence once the examination was complete. The foregoing undermines any argument that the flex connector was merely lost.

Barron testified and PSI represented throughout the litigation of this case that the cause of the leak was the flex connector. For the majority of the litigation, PSI represented that the flex connector was manufactured by Titeflex. PSI's failure to preserve the flex connector significantly prejudiced both Head and Titeflex. Head was unable to determine with certainty liability, causation, and fault for the enormous leak of diesel fuel. Head was forced to rely solely on PSI's determination of the cause of the leak, the licensed contractor who originally installed the underground storage tank and

25

ATG systems and whose president anticipated being sued once the leak was discovered. Head was precluded from obtaining a second opinion about the cause of the leak from another licensed contractor and was induced to file suit against Titeflex because of PSI's allegations. Cordova testified that it would have been a violation of state regulations if Head had independently conducted an investigation of the underground storage tank system without the assistance of a licensed contractor like PSI. Thus, Head was at PSI's mercy.

Titeflex was also prejudiced by PSI's failure to preserve the flex connector because the part itself was the basis of Titeflex's liability. Barron testified that he created handwritten notes stating that the flex connector was manufactured by Titeflex, yet he failed to produce those notes. In addition, Barron's photographs of the flex connector failed to demonstrate that the flex connector had indeed been manufactured by Titeflex. Had Head and Titeflex been given the opportunity to examine the flex connector, they likely would have been able to easily determine whether Titeflex was the manufacturer of the part and whether the part was defective. Moreover, had PSI produced the flex connector, it is very likely that Titeflex would not have been involved in this lawsuit from the beginning. Essentially, the flex connector was a key piece of evidence to both Head and Titeflex, and PSI's failure to produce the part prejudiced both parties significantly.

Based on the foregoing, we conclude that a reasonable person would have deduced from the severity of the 20,000-gallon diesel fuel leak and other circumstances surrounding the leak that there was a substantial chance for litigation, especially considering Barron admitted as much at trial. *See Johnson*, 106 S.W.3d at 722; *see*

26

*also Dillard*, 171 S.W.3d at 209. Further, because the flex connector was a central piece of evidence in determining the actual cause of the leak and who was at fault, it was reasonable to conclude that PSI was on notice of its potential relevance. *See Johnson*, 106 S.W.3d at 722; *see also Dillard*, 171 S.W.3d at 209. We further conclude that Head and Titeflex both demonstrated that they were significantly prejudiced by PSI's failure to produce the flex connector. In any event, PSI blames its attorneys, insurance company, and Hendrix for its inability to produce the flex connector.

> A spoliator can defend against an assertion of negligent or intentional destruction by providing other explanations for the destruction. For example, if the destruction of the evidence was beyond the spoliator's control or done in the ordinary course of business, the court may find that the spoliator did not violate a duty to preserve evidence. Importantly though, *when a party's duty to preserve evidence arises before the destruction or when a policy is at odds with a duty to maintain records, the policy will not excuse the obligation to preserve evidence.*

*Trevino*, 969 S.W.2d at 957 (Baker, J., concurring) (emphasis added). As we have explained above, PSI had a duty to preserve the flex connector. The fact that PSI was not requested to produce the flex connector until several years later when the lawsuit was filed is inconsequential because the evidence establishes that the part was missing since February 2002, which was well within the governing limitations period. *See id.*

## B. The Trial Court's Striking of PSI's Affirmative Defenses

With regard to the trial court's striking of PSI's affirmative defenses, PSI asserts that the sanctions violate the *Transamerican* standard and are excessive. First, PSI states that the trial court failed to articulate a connection between the alleged spoliation—the failure to produce the alleged faulty flex connector—and the striking of PSI's affirmative defenses. In support of this statement, PSI, once again, suggests that it did not have a duty to preserve the evidence once the limitations period expired while

citing to our opinion in *Thomas v. State.* 226 S.W.3d 697, 710 (Tex. App.–Corpus Christi 2007, pet. dism'd) (stating that "the primary purpose of a statute of limitations—ensuring that a defendant is placed on notice of claims within a reasonable time, when evidence and witnesses are available . . . "). However, as we have previously concluded, PSI had a duty to preserve the alleged faulty flex connector and PSI's argument is belied by the fact that the part has been lost since February 2002, a date which was clearly within the limitations period that PSI argues applies. PSI withheld the production of evidence that was crucial to this case and engaged in numerous actions, as we detail later, designed to minimize its fault in this matter. In addition, PSI moved for summary judgment based upon limitations, even though liability in this case centered on PSI's explanation for the cause of the leak—the alleged faulty flex connector—and PSI failed to produce the part.

Second, PSI contends that it should not be punished because its expert lost the flex connector. *See In re Barnes*, 956 S.W.2d 746, 748 (Tex. App.–Corpus Christi 1997, orig. proceeding) ("Respondent's order extinguished Relators' lawsuit because their counsel did not file verified responses to interrogatories when he had represented to Respondent and opposing counsel that the verifications would be forthcoming. This order had the effect of punishing Relators for the conduct of their counsel. . . . There was no evidence . . . that Relators themselves were doing anything to thwart the discovery process."); *see also Richmond Condos. v. Skipworth Commercial Plumbing, Inc.*, 245 S.W.3d 646, 662 (Tex. App.–Fort Worth 2008, pet denied) (holding that, based on the facts in the case, a sanction against the client "would be unfair and improper

because it would have punished [defendant] for a transgression that it did not commit and for which it bore no responsibility").

With regard to this contention, we first note that the *Skipworth Commercial Plumbing* court, citing to *Transamerican*, stated that "a lawyer cannot shield his client from sanctions; a party must bear some responsibility for its counsel's discovery abuses when it is or should be aware of counsel's conduct and the violation of discovery rules." 245 S.W.3d at 661 (citing *Transamerican*, 811 S.W.2d at 917). Therefore, we disagree with PSI's intimation that the actions of its lawyers in having the flex connector tested shielded PSI from all sanctions. The record reflects that Barron was aware of the fact that Neally gave the flex connector to Hendrix for testing and that Hendrix was unable to produce the flex connector since February 2002. Therefore, PSI cannot credibly assert that it was unaware of the non-production of the flex connector and simply place blame at the feet of its lawyers. Next, and perhaps more importantly, we note that in considering the propriety of a trial court's sanctions, we are not limited to only considering the specific violation committed; we may consider other matters that occurred during the litigation. *See Downer*, 701 S.W.2d at 241; *see also Abascal*, 831 S.W.2d at 561. PSI has engaged in repeated attempts to minimize its fault in this matter, as evidenced by: (1) PSI sending Morris to instruct Obregon to re-create inventory records using misleading calculations to show that Head was not diligent in detecting the leak; (2) Barron testifying that he removed the alleged faulty flex connector from the premises, while Rodriguez, the crew-chief, denying that he saw Barron do such a thing; (3) blaming the cause of the leak on Titeflex, the alleged manufacturer of the flex connector, even though no evidence existed to implicate Titeflex; and (4)

29

Corneilissen failing to attend his deposition when he was the sole expert designated to opine that the cause of the leak was the flex connector. We believe that PSI engaged in these actions because Barron anticipated being sued once he was informed about the leak.

Given these actions, we cannot say that the trial court abused its discretion in concluding that PSI, rather than its lawyers, should be sanctioned. *See Mayer*, 104 S.W.3d at 882 (noting that a "just" sanction should be designed to remedy the prejudice caused to the innocent party and visited upon the offender). Moreover, based on this evidence, we believe that there is a direct relationship between the striking of PSI's affirmative defense and PSI's numerous deceptions in this case. *See Transamerican*, 811 S.W.2d at 917.

Finally, PSI asserts that the sanctions imposed were excessive when considering that a spoliation instruction was also given and that the trial court should have considered lesser sanctions. PSI is correct in stating that the supreme court requires that a trial court consider less stringent measures before settling on severe sanctions. *See Mayer*, 104 S.W.3d at 883 (citing *Transamerican*, 811 S.W.2d at 917). However, "[c]ase determinative sanctions may be imposed in the first instance only in exceptional cases when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules." *GTE Comm'cns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding); *Transamerican*, 811 S.W.2d at 919; *see In re Zenergy, Inc.*, 968 S.W.2d 1, 9 (Tex. App.–Corpus Christi 1997, orig. proceeding); *Marshall v. Ryder Sys., Inc.*, 928 S.W.2d 190, 197 (Tex. App.–Houston [14th Dist.] 1996, writ denied). In fact, "[s]anctions which are so severe that they

30

preclude presentation on the merits should not be assessed absent a party's bad faith or counsel's flagrant disregard for the responsibilities of discovery under the rules." *In re Zenergy, Inc.*, 968 S.W.2d at 9; *see Blackmon*, 841 S.W.2d at 849. Ultimately, as described by the *Transamerican* court, "[t]he punishment should fit the crime." 811 S.W.2d at 917.

Based on the aforementioned acts engaged in by PSI, we do not believe that the imposition of lesser sanctions would have promoted compliance with the discovery rules. *See Tanner*, 856 S.W.2d at 729; *Transamerican*, 811 S.W.2d at 919; *In re Zenergy, Inc.*, 968 S.W.2d at 9; *Marshall*, 928 S.W.2d at 197. In fact, to date, PSI cannot produce the flex connector which it alleges is the cause of the leak, and PSI has not adequately explained what lesser sanctions could have been imposed to promote compliance. Considering all of the circumstances in this case, we conclude that the trial court was justified in concluding that PSI's actions amounted to bad faith and warranted the imposition of more severe sanctions. *See Blackmon*, 841 S.W.2d at 849; *In re Zenergy, Inc.*, 968 S.W.2d at 9; *see also Downer*, 701 S.W.2d at 241; *Abascal*, 831 S.W.2d at 561. Furthermore, considering all of the evidence in the light most favorable to the trial court's judgment, we cannot say that the trial court abused its discretion in imposing sanctions and in issuing the spoliation instruction. *See Cire*, 134 S.W.3d at 838; *Trevino*, 969 S.W.2d at 953 (stating that trial courts have broad discretion to sanction for evidence spoliation, including the imposition of death penalty sanctions); *Daniel*, 981 S.W.2d at 234; *see also Vaughn*, 792 S.W.2d at 143; *Parks*, 652 S.W.2d at 485. In essence, we conclude that the sanctions imposed and the spoliation instruction

given by the trial court "fit the crime" and were not excessive. *See Transamerican*, 811 S.W.2d at 917.

The dissent states that the trial court's sanction of striking PSI's affirmative defenses was so severe as to violate the *Transamerican* standard. *See id.* However, we note that the trial court's sanctions did not preclude PSI from challenging liability on Head's claims by presenting witnesses and evidence in support thereof. Despite the sanctions, Head was still required to prove his causes of actions at trial. Thus, this was not an instance where the trial court struck all of the pleadings of the spoliator, including the spoliator's answer, and conducted a trial solely on damages. As such, we believe that the sanctions imposed were of a lesser nature than those that could have been imposed. *See id.* at 918; *see also* TEX. R. CIV. P. 215.2(b)(5) (allowing the trial court to strike pleadings or parts thereof, dismiss actions with or without prejudice, or render a default judgment for discovery abuses). Therefore, based on the foregoing, we overrule PSI's first issue.

### III.   LIMITATIONS

In its second issue, PSI argues that Head's claims were barred by limitations. Specifically, PSI argues that Head's claims accrued when the leak first occurred, and that the discovery rule and fraudulent concealment doctrine do not apply or do not serve to toll the limitations period such that Head's lawsuit was timely. Head counters that PSI's limitations defense was properly struck as a sanction and because limitations must be pleaded and proved, PSI is not entitled to a judgment on its limitations affirmative defense.

32

The statute of limitations is an affirmative defense.[22] TEX. R. CIV. P. 94; *Fontenot Petro-Chem. & Mar. Servs., Inc. v. LaBono*, 993 S.W.2d 455, 458 (Tex. App.–Corpus Christi 1999, pet. denied) (citing *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988)). It is the defendant's burden to plead and prove its statute of limitations affirmative defense, otherwise it is waived. *See LaBono*, 993 S.W.2d at 458; *Tuttlebee v. Tuttlebee*, 702 S.W.2d 253, 256 (Tex. App.–Corpus Christi 1985, no writ); *see also Devlin-Weinheimer v. Weinheimer*, No. 13-08-00546-CV, 2009 Tex. App. LEXIS 9258, at **13-14 (Tex. App.–Corpus Christi Dec. 3, 2009, pet. denied) (mem. op.). PSI pleaded its limitations affirmative defense; however, the trial court struck this defense, among others, in its sanctions order. Because the trial court struck PSI's limitations defense and because we have concluded that the trial court did not abuse its discretion in issuing its sanctions order, PSI did not plead and prove its affirmative defense of limitations. *See LaBono*, 993 S.W.2d at 458; *Tuttlebee*, 702 S.W.2d at 256; *see also Weinheimer*, 2009 Tex. App. LEXIS 9258, at **13-14. Moreover, this Court has held "that a mere general denial will not place in issue the affirmative defense of limitations which must, pursuant to Rule 94 [of the Texas Rules of Civil Procedure], be specially pleaded." *Wynn v. Wynn*, 587 S.W.2d 790, 792 (Tex. Civ. App.–Corpus Christi 1979, no writ). Accordingly, we overrule PSI's second issue.

## IV.    HEAD'S CAUSES OF ACTION

---

[22] Ordinarily, the limitations period for negligence causes of action and causes of action for breach of an implied warranty arising out of an oral contract is two years from the accrual date. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West Supp. 2010); *see also Certain-Teed Prods. Corp. v. Bell*, 422 S.W.2d 719, 721 (Tex. 1968). Breach of contract, fraud, breach of fiduciary duty, and breach of an implied warranty arising out of a written contract claims have a four-year limitations period. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(4)-(5) (West 2002), § 16.051 (West 2008); *see also Bell*, 422 S.W.2d at 721.

33

By its third through seventh issues, PSI argues that the evidence supporting the jury's verdict as to Head's causes of action is insufficient.

## A. Standard of Review

An appellate court will sustain a legal sufficiency or "no-evidence" challenge if the record shows: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the jury's verdict and indulge every reasonable inference that supports it. *Id.* at 821-22; *Harris County v. Vernagallo*, 181 S.W.3d 17, 24 (Tex. App.–Houston [14th Dist.] 2005, no pet.); *Prairie View A&M Univ. v. Brooks*, 180 S.W.3d 694, 705 (Tex. App.–Houston [14th Dist.] 2005, no pet.). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *See City of Keller*, 168 S.W.3d at 827-28; *Vernagallo*, 181 S.W.3d at 24; *Brooks*, 180 S.W.3d at 705. We must credit favorable evidence if a reasonable trier of fact could have, and disregard contrary evidence unless a reasonable trier of fact could not have. *Ingram*, 288 S.W.3d at 893; *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *City of Keller*, 168 S.W.3d at 827. The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Vernagallo*, 181 S.W.3d at 24; *Brooks*, 180 S.W.3d at 705. Moreover, in reviewing the sufficiency of the evidence, we may not substitute our own judgment for that of the trier of fact, even if we

would reach a different answer on the evidence. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *see also Scoggins Constr. Co. v. Dealers Elec. Supply Co.*, No. 13-06-00368-CV, 2009 Tex. App. LEXIS 8171, at *9 (Tex. App.–Corpus Christi Oct. 22, 2009, pet. denied) (mem. op. on remand).

In reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence in the case and set aside the verdict and remand the cause for a new trial if we conclude, viewing the evidence in a neutral light, that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, regardless of whether the record contains some "evidence of probative force" in support of the verdict. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761-62 (Tex. 2003); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). The evidence supporting the verdict is to be weighed along with the other evidence in the case, including that which is contrary to the verdict. *Jackson*, 116 S.W.3d at 761-62. If we determine that the evidence supporting the jury's verdict is not supported by factually sufficient evidence, we must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Dow Chem Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam).

In the context of a jury trial, the sufficiency of the evidence is reviewed in the light of the charge submitted if no objection is made to the charge. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001). Here, although PSI expressed many concerns with the jury charge, it appears from the record that the concerns were resolved in PSI's favor in the charge given to the jury, and the trial court, therefore, ever ruled on its

objections, if any. Thus, we review the evidence under the law as set out in the jury charge. *See Romero*, 166 S.W.3d at 221; *see also Sturges*, 52 S.W.3d at 715.

## B. Breach of Fiduciary Duty

In its third issue, PSI argues that there is no evidence that PSI agreed to be subject to Head's control; that there is no evidence that Head controlled the details of PSI's work; that it did not owe general fiduciary duties to Head; and that Head failed to prove damages sustained as the result of the alleged breach of fiduciary duty. Essentially, PSI attacks all three elements of Head's breach of fiduciary duty cause of action.

### 1. Applicable Law

The charge asked the jury whether it believed that PSI was an agent of Head. Agency was defined as:

> [A] consensual relationship requiring that an agent-to-be and a principal-to-be consent to their association with each other.

> The definition of agency requires as an essential element that the agent consent to act on the principal's behalf, as well as subject to the principal's control.

> Performing a duty created by contract may well benefit the other party but the performance is that of an agent only if the elements of agency are present.

> Proof of agency requires a showing that the alleged principal has the right to assign the alleged agent's task and the right to control the means and details of the process to be used to accomplish this task.

> The right to veto another's decisions does not by itself create the right to give affirmative directives that action be taken, which is integral to the right of control within an agency relationship.

> The principal's power to control the agent distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.

36

> A relationship is not one of agency unless the agent consents to act on behalf of the principal, and the principal has the right throughout the duration of the relationship to control the agent's acts.

The charge further stated that Head must prove that PSI failed to comply with a fiduciary duty owed to Head by showing: (1) the transactions were not fair and were inequitable to Head; (2) PSI did not make reasonable use of the confidence Head placed in it; (3) PSI failed to act in the utmost good faith and exercised the most scrupulous honesty toward Head; (4) PSI placed its own interests above those of Head, which caused a detriment to Head; and (5) PSI failed to fully and fairly disclose important information to Head concerning transactions. *See Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.–Houston [14th Dist.] 2008, pet. denied) (outlining the essential elements of a breach of fiduciary duty claim); *see also Bradshaw v. Bonilla*, No. 13-08-00595-CV, 2010 Tex. App. LEXIS 662, at *9 (Tex. App.–Corpus Christi Jan. 28, 2010, pet. denied) (mem. op.). A plaintiff bears the burden of proving each element of his breach of fiduciary duty claim. *See Avary v. Bank of Am., N.A.*, 72 S.W.3d 779, 792 (Tex. App.–Dallas 2002, pet. denied); *see also SJW Prop. Commerce, Inc. v. Sw. Pinnacle Props., Inc.*, 328 S.W.3d 121, 154 (Tex. App.–Corpus Christi 2010, pet. filed).

A fiduciary relationship may arise as a matter of law in certain formal relationships. *See Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005) (per curiam); *Priddy v. Rawson*, 282 S.W.3d 588, 600 (Tex. App.–Houston [14th Dist.] 2009, pet. denied); *see also Lundy*, 260 S.W.3d at 501; *Cotten v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 698 (Tex. App.–Fort Worth 2006, pet. denied). However, because not every relationship involving a high degree of trust and confidence rises to the stature of a formal fiduciary relationship, the law also recognizes the existence of an informal or

37

confidential fiduciary relationship. *Meyer*, 167 S.W.3d at 330. An informal fiduciary relationship may arise from a moral, social, domestic, or purely personal relationship of trust and confidence. *Id.*; *see Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992); *Priddy*, 282 S.W.3d at 600; *Cotten*, 187 S.W.3d at 698. The moral, social, domestic, or personal relationship upon which the informal or confidential relationship is predicated "'must exist prior to, and apart from the agreement made the basis of the suit.'" *Meyer*, 167 S.W.3d at 331 (quoting *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997)); *Priddy*, 282 S.W.3d at 600; *see Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.–Fort Worth 2004, pet. denied) ("In other words, there must be a preexisting special relationship of trust and confidence that is betrayed in later dealings."). A person is justified in placing confidence in the belief that another party will act in his best interest only where he is accustomed to being guided by the judgment or advice of the other party and there exists a long association in a business relationship as well as a personal friendship. *Hoggett v. Brown*, 971 S.W.2d 472, 488 (Tex. App.–Houston [14th Dist.] 1997, pet. denied); *see Ins. Co. of Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998) (providing that "confidential relationships may arise when the parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest"); *see also Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) ("The agreement to act on behalf of the principal causes the agent to be a fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking."). Moreover, mere

subjective trust is insufficient to establish a confidential relationship that gives rise to a fiduciary duty. *Meyer*, 167 S.W.3d at 331.

The relationship between agent and principal is a fiduciary relationship. RESTATEMENT (SECOND) OF AGENCY § 1 (1958). An agency relationship does not depend upon the express appointment or assent by the principal; rather, it may be implied from the conduct of the parties. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex. 1992); *see Ross v. Tex. One P'ship*, 796 S.W.2d 206, 210 (Tex. App.–Dallas 1990), *writ denied per curium*, 806 S.W.2d 222 (Tex. 1991); *Mercedes-Benz of N. Am., Inc. v. Dickenson*, 720 S.W.2d 844, 858 (Tex. App.–Fort Worth 1986, no writ). An agent is one who is authorized by another to transact business or manage some affair for him. *Welch v. Coca-Cola Enters., Inc.*, 36 S.W.3d 532, 539 (Tex. App.–Tyler 2000, pet. withdrawn). The existence of an agency relationship may be established by circumstantial evidence based upon proof of all the facts and circumstances that shows the relationship of the parties and throws light upon the character of such relations. *Id.* at 540.

### 2. Discussion

In this case, the jury concluded that PSI was Head's agent and that PSI failed to comply with the fiduciary duty owed to Head, the principal.[23] In particular, the jury found that PSI failed to show that: (1) the transactions between the parties were fair and equitable to Head; (2) it made reasonable use of the confidence that Head placed with it; (3) it acted in the utmost good faith and exercised the most scrupulous honesty towards Head; (4) it did not place its interests above Head's; and (5) it fully and fairly disclosed all important information to Head concerning the transactions involved in this case.

---

[23] Implicit in the jury's finding that PSI was Head's agent is that Head was the principal.

39

### a. Existence of a Duty

In challenging the duty element of Head's breach of fiduciary duty cause of action, PSI directs us to Carpenter's testimony that PSI was simply a "vendor" and that Head simply "relied on" PSI and argues that the record contains no testimony indicating that Head controlled PSI's work. PSI argues that it acted as an independent contractor, not as Head's agent, in installing the underground storage system. *See First Nat'l Acceptance Co. v. Bishop*, 187 S.W.3d 710, 714 (Tex. App.–Corpus Christi 2006, no pet.) ("The party claiming agency must prove the principal has both the right to assign the agent's task and the right to control the means and details by which the agent will accomplish the task. The principal's extent of control over the details of accomplishing the assigned task primarily distinguishes the status of agent from that of independent contractor.") (citations omitted). We disagree.

The evidence establishes that PSI and Head had a long-standing relationship dating back to 1997, when Head first contracted with PSI to remove the three steel tanks and implement the new underground storage tank system. Head continued to use PSI exclusively to perform work on the underground storage tank system. In fact, the record demonstrates that PSI made repairs to the underground storage tank system at least fifty times from 1997 to 2001. In October 1999, based on PSI's recommendation, Head authorized PSI to install a new ATG system, which was designed to allow Head to discontinue using the stick method to monitor inventory levels. In addition, PSI accepted responsibility for ensuring that Head's system was compliant with State rules and regulations. PSI advised Head regarding the system's registration, monthly leak tests, monthly inventory control, and annual line and leak

detector tests. Carpenter testified that PSI conducted annual tank tightness and line tightness tests at the direction of Head so that the truck stop could obtain a State-mandated fuel-delivery certificate. Beginning in September 1999, PSI sent Morris to the truck stop to speak with Head and his employees about compliance issues, including proper inventory control.

The record also reflects that PSI repeatedly acted on Head's behalf with the TNRCC. PSI filed the initial application with the TNRCC for the construction of the underground storage tank system on behalf of Head. PSI also filed paperwork with the TNRCC pertaining to the cause and scope of the leak on Head's behalf, which included additional calculations and revisions done to the inventory records created by Obregon. Furthermore, Barron testified at trial that "I worked for Bill Head," thereby intimating that PSI was subject to Head's control. Barron himself executed the "Release Determination Report Form" that was filed with the TNRCC as the on-site supervisor. Even Cordova, the TNRCC field investigator, noted that "[f]rom what I can determine, they [PSI] were representing, providing information representing Bill Head." Carpenter testified that he had some input in the paperwork sent to the TNRCC, and he was required to sign the paperwork before it was sent, indicating that he reviewed the paperwork and assented to the representations made by PSI.

Once the leak was detected, PSI agreed to act on behalf of Head in the assessment and remediation of the leak, in compliance with State regulations. Carpenter stated that PSI and ERM were hired to investigate and repair the leak. He noted that: "[w]ell, it was—it was two parties, Environmental Risk Management and Petroleum Solutions, and Mark [Barron] was involved into it because he—you know, he

41

wanted to get to the source of the problems, and I put it in their hands . . . to backtrack and see where it came from." Carpenter further noted that the employees at the truck stop lacked the ability to investigate and repair the leak; thus, Head relied on PSI and ERM for these tasks. Barron tested the tanks and pipes, and after being told about the flex connector, Carpenter directed PSI to make all necessary repairs to the system to "get online and back up and pumping [in] as short time as possible."

PSI directs us to Carpenter's testimony, where he testified that "we [Head] relied on—on them [PSI] to direct us in the correct direction, as far as what was needed at that immediate time." PSI also notes that Head did not exercise control over the means of completing the assigned tasks; in fact PSI was left "entirely free to pursue that assigned task as PSI chose." This testimony appears to conflict with testimony indicating that PSI acted on Head's behalf during the: (1) construction of the underground storage tank system; (2) filing of paperwork with the TNRCC; (3) testing of the system; (4) investigation of the leak; and (5) remediation of the leak. The record contains testimony that Head had input or exerted control over the means of completing most of the assigned tasks, especially with regard to the filing of paperwork and interactions with the TNRCC, and that PSI regularly repaired the system, conducted tests, and ensured that the system remained in compliance with State regulations and standards; therefore, we conclude that PSI owed Head a general fiduciary duty. *See Bishop*, 187 S.W.3d at 714; *see also Field Measurement Serv., Inc. v. Ives*, 609 S.W.2d 615, 619 (Tex. Civ. App.–Corpus Christi 1980, writ ref'd n.r.e.) (noting that the fiduciary duty owed by an agent to his principal is inherent in an agency relationship).

To the extent that Carpenter's testimony indicates that Head relied on PSI and allowed PSI to pursue assigned tasks as PSI chose, we note that the reconciliation of conflicting evidence was within the province of the jury, and we must defer to the jury's resolution so long as the finding is reasonable. *See City of Keller*, 168 S.W.3d at 819; *see also McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (stating that when presented with conflicting evidence, the fact-finder may believe one witness and disbelieve others); *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex. App.–Dallas 1997, pet. denied) (noting that the trier of fact is the exclusive judge of the witnesses' credibility and the weight to be given their testimony). In concluding that PSI was Head's agent, the jury implicitly found that PSI owed Head a fiduciary duty to act for the benefit of Head and clearly rejected PSI's assertion that PSI acted solely as an independent contractor, rather than as Head's agent, when completing tasks for Head. *See City of Keller*, 168 S.W.3d at 819. To the extent that PSI argues that PSI did not owe Head a fiduciary duty because there were not written contracts for every assigned task, we note that Texas courts have held that agency relationships may be implied from the conduct of the parties. *See Orozco*, 824 S.W.2d at 556; *Ross*, 796 S.W.2d at 210; *Dickenson*, 720 S.W.2d at 858.

Based on the foregoing, we conclude that the jury was reasonable in concluding that a fiduciary relationship existed between PSI and Head. *See Johnson*, 73 S.W.3d at 200; *Orozco*, 824 S.W.2d at 556; *Welch*, 36 S.W.3d at 540; *see also Ross*, 796 S.W.2d at 210; *Dickenson*, 720 S.W.2d at 858. Given that, we must now analyze the remaining elements of Head's breach-of-fiduciary-duty claim.

### b. Breach of the Duty and Damages Elements

43

The jury awarded Head damages for: (1) attorney's fees associated with the defense of the enforcement action; (2) cost of emergency clean-up of the November 2001 leak; (3) cost of past remediation of the truck stop; (4) cost of future remediation of the truck stop; (5) value of the diesel fuel lost as a result of the leak; and (6) the cost of the ATG system installed by PSI in 1999. PSI alleges that "[t]here is no evidence any of these damages were proximately caused by a breach of fiduciary duty owed by PSI." The record indicates otherwise.

At trial, the jury heard evidence of numerous instances where PSI put its own interest ahead of Head's interest. The most obvious example is PSI's failure to produce the alleged faulty flex connector when it insisted in documentation to the TNRCC that the flex connector under the fourth dispenser was the cause of the leak. Moreover, the record reflects several instances where PSI failed to provide Head with a copy of the records being provided to the TNRCC. In fact, in one such instance, Head's attorneys requested records regarding the installation of the double-walled fiberglass tanks, records of service and repair work, and PSI operating manuals, but Morris, a PSI employee, refused to provide the documents despite having the records in his possession. In addition, Obregon testified that PSI sent Morris to assist in revising inventory control records for the truck stop. Witnesses noted that Morris instructed Obregon to round-off and alter figures using gross calculations, rather than net, before reporting inventory numbers to the TNRCC.[24] Head's experts opined that these figures were altered to minimize PSI's fault with respect to the leak and to show that Head was

_____

[24] Obregon testified that he was unsure about the whereabouts of the records he created prior to Morris's instructions to recreate records. Obregon noted that someone took the records, and he never saw them again. Moreover, PSI's own expert, Mark Owens, testified that net figures should be used when reconciling inventory figures.

44

not diligent in discovering the leak. Pruneda, another PSI employee, and other witnesses testified that the real cause of the leak was an improper installation of a union at a shear valve, rather than the flex connector that Barron blamed at trial and in paperwork filed with the TNRCC. This testimony gives rise to an inference that PSI negligently installed the underground storage tank system and, thus, caused the leak and the damages associated with discovering, cleaning up, and remediating the leak. Furthermore, the record also gives rise to an inference that PSI employees, namely Barron and Morris, engaged in a coordinated effort to place blame for the leak at the feet of Head. Clearly, such actions would constitute a breach of the fiduciary duty owed by PSI to Head. *See Lundy*, 260 S.W.3d at 501; *see also Bradshaw*, 2010 Tex. App. LEXIS 662, at *9.

The jury also heard evidence that Cordova relied upon representations made by PSI to complete his TNRCC investigative report, which served as the basis for the more than $300,000 in fines assessed against Head. Cordova admitted that Morris was a colleague of his at the TRNCC; in fact, Cordova acknowledged that Morris trained him to be an investigator. Never at any point during Cordova's investigation did PSI intervene on Head's behalf. Among the fines assessed against Head were for failing to do annual testing on the underground piping and leak detectors. This testing had been done, but PSI failed to mention that to Cordova. Morris failed to tell Cordova that PSI had the installation records for Head's system, and Head was subsequently fined for failing to produce those records. In addition, Head was fined for failing to correctly label each underground storage tank, which several witnesses testified was PSI's responsibility. Head also received a fine associated with monthly inventory control

45

records, and once again, PSI failed to inform Cordova that the ATG system had been repaired numerous times and often produced faulty readings. Though the $300,000 in fines assessed against Head by the TNRCC were reduced, Head was still forced to pay approximately $30,000 in fines and incurred significant costs in defending the enforcement action, which required Head to demonstrate compliance with State rules and regulations, something that PSI could have and should have done as Head's agent.

From this evidence, we conclude that a jury could reasonably infer that PSI breached the fiduciary duty it owed to Head and that the damages awarded resulted from the breach by PSI. *See Si Kyu Kim v. Harstan, Ltd.*, 286 S.W.3d 629, 635 (Tex. App.–El Paso 2009, pet. denied) (citing *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.–Dallas 2006, pet. denied)) (stating that breach of fiduciary duty requires a showing that the breach caused an injury); *Punts v. Wilson*, 137 S.W.3d 889, 891 (Tex. App.– Texarkana 2004, no pet.)) (same); *see also Wells Fargo Bank, N.A. v. Crocker*, No. 13-07-00732-CV, 2009 Tex. App. LEXIS 9791, at *10 (Tex. App.–Corpus Christi Dec. 29, 2009, pet. denied) (noting that a plaintiff has the burden of proving each element of his breach of fiduciary duty claim). As a result, we hold that there exists more than a scintilla of evidence to support the jury's findings pertaining to Head's breach of fiduciary duty claim. *See City of Keller*, 168 S.W.3d at 810. We further hold that, after reviewing the evidence in a neutral light, the jury's findings as to Head's breach of fiduciary duty claim is not against the great weight and preponderance of the evidence as to be manifestly unjust. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761-62. PSI's third issue is overruled.

**C. Fraud**

In its fourth issue, PSI challenges the jury's finding that PSI committed fraud against Head. Specifically, PSI asserts that there is no evidence of fraud, nor is there evidence that any possible material misrepresentation caused the damages sustained by Head.

**1. Applicable Law**

The elements of a cause of action for fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party suffered injury as a result. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001); *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). A promise to do an act in the future constitutes fraud only when made with no intention of performing the promise at the time the promise was made. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998). The mere failure to perform a contract is not evidence of fraud. *Id.* Fraudulent intent may be established by either direct or circumstantial evidence, and the subsequent failure to perform the promise, while not alone dispositive, can be considered with other factors to establish intent. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434-35 (Tex. 1986).

"Pure expressions of opinion are not actionable. It has been held that a representation, to be actionable, must be a representation of a material fact." *Trenholm*

47

*v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *see Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 163 (Tex. 1995) ("A statement is not fraudulent unless the maker knew it was false when he made it or made it recklessly without knowledge of the truth."). Moreover, a statement is regarded as material if "it is important to the party to whom it is made in making a decision regarding the particular transaction. Material means a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question." *Burleson State Bank v. Plunkett*, 27 S.W.3d 605, 613 (Tex. App.–Waco 2000, pet. denied) (citing *Beneficial Personnel Serv. v. Porras*, 927 S.W.2d 177, 186 (Tex. App.–El Paso 1996), *vacated and remanded by agreement*, 938 S.W.2d 716 (Tex. 1997); *Am. Med. Int'l, Inc. v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App.–Houston [14th Dist.] 1991, no writ)).

## 2. Discussion

Here, the jury was instructed that:

Fraud occurs when:

a. a party makes a material misrepresentation,

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion,

c. the misrepresentation is made with the intention that it should be acted on by the other party, and

d. the other party actually and justifiably relies on the misrepresentation and thereby suffers injury.

The charge defined "[m]isrepresentation" as a "false statement of fact."

48

The evidence adduced at trial shows that PSI made numerous misrepresentations to Head, including the qualities and characteristics of the underground storage tank system and PSI's services, the proper measure for calculating inventory, and the source of the diesel fuel discharge. Head testified that representatives from PSI told him that the ATG system "was supposed to do all the work and should—should alert us whenever we had a leak" and that the ATG system would allow Head to discontinue stick readings. However, the ATG system malfunctioned soon after the date of installation; in fact, PSI came to repair the ATG system more than fifty times from 1997 to 2001. It certainly did not operate as represented. Although the leak was not discovered until November 2001, experts opined that the leak likely began in March 2001. Moreover, Cordova testified that even though Head had an ATG system installed, State regulations required that operators continue to conduct stick readings or engage in other measuring techniques as a back-up to an automatic tank gauging system, though this fact was never represented to Head.

Furthermore, Obregon testified that he was responsible for compiling monthly inventory records at the truck stop. In doing so, Obregon calculated daily inventory totals using net figures generated by the ATG system, rather than using gross figures, which are not adjusted for evaporation. Shortly after the leak was discovered, Morris unexpectedly paid a visit to the truck stop. Morris represented to Obregon that State rules and regulations required that inventory figures be rounded off and expressed in gross numbers for gallons received in order to calculate daily inventory amounts. Because Obregon had used net figures to do his inventory calculations, Morris

49

instructed Obregon to recreate several months of monthly inventory control records for the truck stop using gross numbers, though Mark Owens, PSI's expert, testified that State rules and regulations require that net figures be used and that the use of net figures is more accurate for assessing inventory.

Additionally, PSI represented to Head and the TNRCC that the cause of the leak was the flex connector under the fourth dispenser. PSI also represented this to the TNRCC on Head's behalf. In fact, Barron signed the discharge determination report as on-site supervisor conducting the repair work after the leak and noted that the flexible connection under the fourth dispenser had failed. However, after representing the cause of the leak to both Head and the TNRCC, Barron removed the alleged faulty flex connector from the premises, and the part was never seen again, thus making it impossible to determine with certainty whether the particular flex connector that was allegedly removed from the premises was indeed the cause of the leak. In any event, PSI's representations about the cause of the leak were undermined by testimony at trial. One of Head's experts, Curran, stated that the source of the leak was a union underneath the fourth dispenser. Curran based his opinions on, among other things, the testimony of both Pruneda and Rodriguez. Pruneda, a technician for PSI, testified that installers for PSI had improperly cross-threaded the union in question, which caused a small leak in the system, and warranted replacement. Moreover, Curran noted that the design called for pipes that were not large enough in diameter to reduce pressure in the piping system when combined with the high-powered pump. Curran opined that the high pressure in the pump prevented the ATG system from detecting whether the system was leaking.

50

In addition to this testimony, Rodriguez failed to corroborate Barron's statements regarding the removal of the flex connector from the premises. Rodriguez testified that none of the flex hoses were leaking, and as crew chief during the clean-up, he denied ever seeing Barron test the alleged faulty flex connector, much less place the part in the back of his truck to be removed from the premises. As is clear from this evidence, PSI made several false representations to Head throughout the course of their business relationship.

As a result of the false representations made by Morris, Obregon recreated the inventory records for the truck stop to coincide with Morris's instructions. By doing this, the newly recreated records seemed to suggest that Head failed to notice an obvious leak in the system. And the fact that the records were submitted to the TNRCC and were recreated immediately after the discharge occurred gives rise to an inference that PSI was attempting to avoid fault for the leak. This inference is further supported by PSI's representations that the flex connector was the cause of the leak, yet failed to produce the part that was allegedly defective. Barron's repeated insistence to Head and the TNRCC that the defective flex connector caused the leak induced Head to believe that the defective product was the cause of the leak and, thus, sue Titeflex, the company that Barron represented as the manufacturer of the part. Further, Head's reliance on PSI's representations about the underground storage tank and ATG systems induced Head to discontinue stick readings, which resulted in fines assessed by the TNRCC and reduced Head's ability to detect a leak in the system. Moreover, Morris's instructions to Obregon regarding the inventory records resulted in calculation errors, which, in turn, resulted in more fines assessed against Head. In order to reduce

51

the fines assessed, Head disputed the enforcement action and incurred $42,925 in attorney's fees and $2,800 in expenses. Furthermore, as a result of PSI's representations about its systems and the subsequent leak and clean-up, Head incurred significant costs, including those associated with the fifty repair requests from 1997 to 2001, the lost diesel fuel, and the cost of clean-up and remediation, which the jury properly awarded.

Based on the foregoing, we conclude that the record contains more than a scintilla of evidence to support the jury's finding on Head's fraud claim. *See City of Keller*, 168 S.W.3d at 810; *see also Ernst & Young, L.L.P.*, 51 S.W.3d at 577; *Bradford*, 48 S.W.3d at 754-55; *Johnson & Higgins of Tex., Inc.*, 962 S.W.2d at 526; *Spoljaric*, 708 S.W.2d at 434-35. We further conclude that, after reviewing the evidence in a neutral light, the jury's findings as to Head's fraud claim is not against the great weight and preponderance of the evidence as to be manifestly unjust. *See Golden Eagle Archery, Inc.*, 116 S.W.3d at 761-62. Accordingly, we overrule PSI's fourth issue.

**D. Breach of Contract**

By its fifth issue, PSI challenges the sufficiency of the evidence supporting Head's contract claim. PSI contends that: (1) there is no evidence that PSI agreed to build, install, or service the underground storage tank system in accordance with undefined environmental rules and regulations and industry standards; (2) the alleged agreement is unenforceable as a matter of law; (3) if an enforceable contract existed, the evidence is insufficient to show that any failure to comply resulted in the damages awarded by the jury; and (4) the damages awarded were not foreseeable. Head asserts

52

that the evidence supporting his contract claims is sufficient to establish the essential elements of his breach of contract claim.

### 1. Applicable Law

Whether a contract exists is a question of fact for the jury. *See Ward v. Ladner*, 322 S.W.3d 692, 698 (Tex. App.–Tyler 2010, pet. filed) (citing *Am. Transfer & Storage Co. v. Reichley*, 543 S.W.2d 162, 164 (Tex. App.–Amarillo 1976, writ ref'd)); *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 555-56 (Tex. App.–Houston [14th Dist.] 2002, no pet.) (describing implied contracts as those inferred from the acts and conduct of the parties when the facts and circumstances show a mutual intent to contract); *Adams v. H&H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.–Corpus Christi 2001, no pet.) (holding that a jury can properly imply the formation of a contract from any conduct by both parties recognizing the existence of a contract). To recover for breach of contract, a plaintiff must prove: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach by the defendant; and (4) harm to the plaintiff as a result of the breach. *See Adams v. H&H Meat Prods., Inc.*, 41 S.W.3d 762, 771 (Tex. App.–Corpus Christi 2001, no pet.); *see also Beckham Resources, Inc. v. Mantle Resources, L.L.C.*, No. 13-09-00083-CV, 2010 Tex. App. LEXIS 1323, at *22 (Tex. App.–Corpus Christi Feb. 25, 2010, pet. denied).

A contract must be sufficiently definite in its terms so that a fact-finder can understand what the promisor undertook. *See Meru v. Huerta*, 136 S.W.3d 383, 390 (Tex. App.–Corpus Christi 2004, no pet.). If the agreement upon which the plaintiff relies is so indefinite as to make it impossible for the fact-finder to determine the legal obligations and liabilities of the parties, it is not an enforceable contract. *Id.*

53

Furthermore, to be legally binding, the parties must have a meeting of the minds and must communicate consent to the terms of the agreement. *Id.* The determination of a meeting of the minds is based upon an objective standard of what the parties said or did rather than on their subjective state of mind. *Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex. App.–Dallas 2006, no pet.) (citing *Wal-Mart Stores, Inc. v. Lopez*, 93 S.W.3d 548, 556 (Tex. App.–Houston [14th Dist.] 2002, no pet.)).

### 2. Discussion

Here, the jury was asked whether PSI agreed "that [PSI] would build, install or service the underground storage tank system in accordance with environmental rules and regulations of the State of Texas and Industry Standards" and if so, whether PSI failed to comply with this agreement. The jury answered in the affirmative to both questions.

At trial, Barron testified that only a licensed, State-approved entity, such as PSI, may install an underground storage tank system. State rules and regulations prevent Head from installing his own underground storage tank system. Barron further testified that PSI is in the business of selling and servicing all products relating to fueling systems, including the installation, maintenance, and repair of such systems. Because Head was not a licensed, State-approved installer of underground storage tank systems, and because PSI excelled in such areas, in 1996, Head contracted with PSI to remove the pre-existing steel tanks and replace them with the double-walled fiberglass underground storage tank system.

Barron noted that PSI is a leader in this industry; that it follows State rules and regulations associated with the installation and maintenance of the systems; and that

54

PSI assists clients in complying with applicable rules and regulations. In fact, PSI was required to install the underground storage tank and ATG systems in compliance with State rules and regulations. Once PSI installed the underground storage tank system, PSI recommended that Head install the ATG system. Based on PSI's recommendations, Head contracted with PSI to have the ATG system installed. Several witnesses testified that PSI promised to service and repair both systems. From 1997 to 2001, PSI serviced and repaired the systems on more than fifty occasions. With regard to the underground storage tank system, Head paid PSI $192,647.37 for the installation, service, and repair of this system. And after the leak was discovered, Head hired PSI to investigate and clean up, and PSI agreed to repair the leak and get operations back online.

From the start, Head experienced numerous problems with the underground storage tank and ATG systems. Barron acknowledged at trial that it was PSI's responsibility to test the system's leak detectors each year to ensure that they were operating properly. Barron later mentioned that he was unsure whether such testing had actually occurred every year. Instead, Barron argued that it was Head's responsibility to have the leak detectors tested; that Head could have used another vendor to do the testing; and that PSI only went out to the truck stop when requested to do so. Barron's testimony is undermined by Carpenter's assertion that PSI was Head's exclusive vendor regarding the underground storage tank system. In any event, several witnesses testified that PSI's failure to properly install the systems caused the leak in question, and thus, Head incurred significant damages. Pruneda, in particular,

acknowledged that the leak was caused by a negligently-installed union under the fourth dispenser.

Owens, PSI's own expert, testified that had the ATG system been installed properly or worked properly, the more than 20,000 gallon-leak would have been detected earlier. Owens stated that the system failed to go into "slow flow mode" once the leak occurred. Al Soto, a thirty-year employee of PSI and certified installer of underground storage tank systems, noted that if installed correctly, the primary and secondary walls of the underground storage tank system should not both fail and that fact that they did was "unacceptable." If one of the walls failed, the secondary wall should have absorbed any leakage. However, the entire underground storage tank system and the ATG system failed. Dr. Pinkston opined that the likelihood of all of these systems failing at once was 1 in 500 years, or in other words, it should have been "an extremely remote possibility." These failures caused Head to incur the damages awarded, including the cleanup of the leak, past and future remediation, the cost of the lost diesel fuel, substantial TNRCC fines, and attorney's fees associated with this case and the enforcement action with the TNRCC.

Despite the foregoing, PSI asserts that there existed no written agreement between Head and PSI to build, install, or service either system "in accordance with environmental rules and regulations of the State of Texas and Industry Standards." PSI further asserts that the agreements between the parties are unenforceable because they lack definiteness. We disagree.

The evidence demonstrates that the parties agreed for PSI to install the underground storage tank and ATG systems in exchange for payment. In addition,

56

witnesses testified that PSI regularly repaired and serviced the systems and conducted annual testing on the systems, as required by the TNRCC. Implicit in these agreements was that PSI would install, maintain, and service these systems "in accordance with environmental rules and regulations of the State of Texas and Industry Standards." We do not find PSI's argument persuasive, especially considering Barron's testimony that PSI was required to comply with State rules and regulations in installing, repairing, and servicing the systems. Moreover, Barron testified that PSI prides itself on complying with governing rules and regulations when installing, repairing, and servicing its clients' systems and that PSI offers its clients advice about compliance issues. In fact, PSI sent Morris to consult Obregon and Carpenter regarding inventory control records for compliance purposes. This evidence amounts to more than a scintilla that PSI agreed to install, service, and repair the systems at the truck stop "in accordance with environmental rules and regulations of the State of Texas and Industry Standards." *See City of Keller*, 168 S.W.3d at 810. We, therefore, reject PSI's assertion that the agreements between PSI and Head were unenforceable for lack of definiteness.

Next, PSI argues that there is not sufficient evidence to demonstrate that PSI breached the agreements with Head and subsequently caused Head damages. PSI also contends that the damages awarded constituted consequential damages, which were not recoverable because the damages were not foreseeable to the parties at the time of contracting. In a breach of contract suit, damages are limited to the actual damages that are the natural, probable, and foreseeable consequence of the defendant's breach. *Hallmark v. Hand*, 885 S.W.2d 471, 481 (Tex. App.–El Paso 1994, writ denied) (citing *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981));

57

*Strain v. Gansle*, 768 S.W.2d 345, 346-47 (Tex. App.–Corpus Christi 1989, writ denied) ("It is well established that compensatory damages may be recovered in an action for breach of contract when 'the loss is the natural, probable and foreseeable consequence of the defendant's conduct.'").  We disagree with PSI's contention that the negligent installation of the underground storage tank system or the implementation of a defective product in the system and the failure of the ATG system would not potentially result in a leak and that foreseeable damages would include the costs of the lost fuel, cost of the clean-up of the leak, past and future remediation, and other damages that the jury awarded.  As we have already concluded, implicit in PSI's agreement to install, repair, and service the underground storage tank and ATG systems was a duty to act in accordance with State rules and regulations and industry standards.  The record reflects that the failed systems did not comply with such rules, regulations, and standards and resulted in a leak that cost Head significantly to clean up and remediate.  We believe that such damages could have been foreseen at the time the parties contracted and the damages naturally flowed from PSI's breaching of the agreements it had with Head.  *See Mead*, 615 S.W.2d at 687; *see also Hallmark*, 885 S.W.2d at 481; *Strain*, 768 S.W.2d at 346-47.  In fact, had PSI complied with such rules, regulations, and industry standards the leak in this case likely would not have happened, and Head would not have sustained any damages.  We, therefore, reject PSI's argument that the evidence supporting the breach, causation, and damages elements of Head's breach of contract action is insufficient.

Our review of the record reveals that more than a scintilla of evidence exists to support the jury's finding on Head's breach of contract claim.  *See City of Keller*, 168

S.W.3d at 810. We further hold that, after reviewing the evidence in a neutral light, the jury's findings as to Head's breach of contract claim is not against the great weight and preponderance of the evidence as to be manifestly unjust. *See Golden Eagle Archery, Inc.,* 116 S.W.3d at 761-62. Accordingly, we overrule PSI's fifth issue.

## E. Negligence

By its sixth issue, PSI challenges the sufficiency of the evidence supporting the jury's negligence finding. PSI argues that the record contains no evidence of the standard of care for a certified installer, builder, or service representative of an underground storage tank system. Additionally, PSI contends that there is no evidence indicating that PSI employees breached the applicable standard of care or proximately caused the damages associated with the leak.

We note that the record is clear that Head did not elect to recover on his negligence cause of action. The final judgment specifically notes that Head's damage award is premised on his breach of contract, breach of implied warranty, fraud, and breach of fiduciary causes of action. Because we have concluded that the judgment can be sustained on Head's breach of fiduciary duty, breach of contract, or fraud claims, we need not address PSI's challenges to the jury's negligence findings. *See* TEX. R. APP. P. 47.1; *see also Dana Corp. v. Microtherm, Inc.*, No. 13-05-00281-CV, 2010 Tex. App. LEXIS 408, at *46 (Tex. App.–Corpus Christi Jan. 21, 2010, pet. granted, judgm't vacated w.r.m.) (mem. op.); *S. Ins. Co. v. Poal, Inc.*, No. 13-05-00532-CV, 2008 Tex. App. LEXIS 3911, at *15 (Tex. App.–Corpus Christi May 22, 2008, no pet.) (mem. op.) ("We also decline to address Southern's fourth issue because the award of attorney's

fees in the interpleader action is dependent on the resolution of other claims that remain and is not dispositive of this appeal."). We overrule PSI's sixth issue.

## F. Breach of Warranty

In its seventh issue, PSI maintains that the evidence does not indicate it expressly or impliedly warranted to perform services in a good and workmanlike fashion. In the alternative, PSI argues that if such a warranty existed, the record contains no evidence that PSI failed to comply and, thus, proximately caused Head's damages. Head counters that there exists a compelling need for an implied warranty "to protect Texans from harm caused by stored hydrocarbon leaks." Head does not refute PSI's argument regarding the existence of an express warranty between the parties.

Because we have concluded that the judgment can be sustained on Head's breach of fiduciary duty, breach of contract, or fraud claims, we need not address PSI's challenges to the jury's warranty liability findings. *See* Tex. R. App. P. 47.1; *see also Dana Corp.*, 2010 Tex. App. LEXIS 408, at *46; *Poal, Inc.*, 2008 Tex. App. LEXIS 3911, at *15. We overrule PSI's seventh issue.

## V. HEAD'S ATTORNEYS FEES AND PRE-JUDGMENT INTEREST

By its eighth and ninth issues, PSI contends that it is entitled to judgment as a matter of law on Head's claims for attorney's fees and pre-judgment interest. With respect to Head's attorney's fees claim, PSI argues that: (1) no contract or statute permits Head to recover attorney's fees; (2) Head failed to meet the requirement of presentment under section 38.02 of the civil practice and remedies code, *see* Tex. Civ. Prac. & Rem. Code Ann. § 38.02 (West 2008); and (3) Head failed to segregate

60

recoverable from unrecoverable attorney's fees. Regarding its pre-judgment interest contention, PSI asserts that Head cannot recover pre-judgment interest on future damages, nor can he recover pre-judgment interest without evidence and a finding that he provided written notice of his claim on November 10, 2001.

## A. Attorney's Fees

Section 38.001(8) of the civil practice and remedies code authorizes the recovery of reasonable attorney's fees based on contract claims. *Id.* § 38.001(8) (West 2008). A party who prevails on a breach of contract claim and is awarded damages may recover its reasonable attorney's fees under section 38.001(8) of the civil practice and remedies code. *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997); *see Intercontinental Group P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 653 (Tex. 2009) ("Under the American Rule, litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties."); *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310-11 (Tex. 2006). An award of attorney's fees is mandatory under section 38.001 upon proof of reasonableness. *World Help v. Leisure Lifestyles, Inc.*, 977 S.W.2d 662, 683 (Tex. App.–Fort Worth 1998, pet. denied) (citing *Atlantic Richfield Co. v. Long Trusts*, 860 S.W.2d 439, 449 (Tex. App.–Texarkana 1993, writ denied); *Budd v. Gay*, 846 S.W.2d 521, 524 (Tex. App.–Houston [14th Dist.] 1993, no writ)). Nevertheless, the amount of the attorney's fees award lies within the discretion of the trial court and will only be reversed for an abuse of that discretion. *Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990); *see Dail v. Couch*, 99 S.W.3d 390, 391 (Tex. App.–Corpus Christi 2003, no pet.). The test for abuse of discretion is to

61

determine whether the trial court acted without reference to any guiding rules or principles, or whether, under the circumstances of the case, the trial court's actions were arbitrary or unreasonable. *Downer*, 701 S.W.2d at 241-42.

In this case, the jury concluded that PSI breached agreements with Head, and we have affirmed the jury's decision. Because Head prevailed on his breach of contract claim and was awarded damages, he was entitled to reasonable attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8); *see also Solis*, 951 S.W.2d at 390. On appeal, PSI does not challenge the reasonableness of the attorney's fees awarded, but it does argue that Head failed to timely present his breach of contract claim and that he failed to segregate attorney's fees so that the fees were recovered solely under his breach of contract claim.

## 1. Presentment

PSI asserts that Head failed to timely present his contract claim and that the filing of suit cannot satisfy the requirements of section 38.002. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.002[25]; *Llanes v. Davila*, 133 S.W.3d 635, 641 (Tex. App.–Corpus Christi 2003, no pet.).[26] Head counters that based on a correspondence sent on May

---

[25] Section 38.002 of the civil practice and remedies code provides that:

To recover attorney's fees under this chapter:

(1) the claimant must be represented by an attorney;

(2) the claimant must present the claim to the opposing party or to a duly authorized agent of the opposing party; and

(3) payment for the just amount owed must not have been tendered before the expiration of the 30th day after the claim is presented.

TEX. CIV. PRAC. & REM. CODE ANN. § 38.002 (West 2008).

[26] In *Llanes v. Davila*, this Court noted that:

62

30, 2002, PSI knew of his contract claim more than thirty days before trial. Head also argues that PSI waived this contention by failing to object in the trial court to the amount of attorney's fees, the reasonableness of the attorney's fees, and the necessity of the work performed.

There is no indication that PSI objected in the trial court to Head's apparent failure to present his contract claim. Moreover, PSI did not file a verified denial that Head failed to present his contract claim. Thus, this contention has not been preserved for appeal.[27] *See* TEX. R. APP. P. 33.1; *Llanes*, 133 S.W.3d at 641; *see also Reveille Trucking, Inc. v. Loera Customs Brokerage, Inc.*, No. 13-08-00127-CV, 2010 Tex. App.

---

> To recover attorney's fees, the claimant must present the claim to the opposing party. The purpose of the presentment requirement is to allow the person against whom a claim is asserted an opportunity to pay within thirty days of receiving notice of the claim, without incurring an obligation for attorney's fees. The party must plead and prove that he or she presented a contract claim to the opposing party, and the opposing party failed to tender performance. No particular form of presentment of a claim is required.
>
> . . . .
>
> In the instant case, appellees argue that presentment was made through their pleadings and participation in mediation. However, neither the filing of a suit, nor the allegation of a demand in the pleadings can alone constitute presentment of a claim or a demand that the claim be paid.

133 S.W.3d 635, 641 (Tex. App.–Corpus Christi 2003, no pet.) (internal citations omitted).

[27] In any event, we note that record contains a letter dated May 30, 2002, in which Head's counsel stated, in regards to PSI's requests for payment for work performed at the truck stop, that:

> Your letter dated May 21, 2002[,] grossly over[]simplifies the current situation between our clients. It is my understanding that equipment installed by your client [PSI] resulted in a fuel spill at the Truck Stop and damages ensuing therefrom. Based upon my review of the situation and in the event your client elects to pursue this matter further, you will leave my client with no option other than to allege causes of action against your client for *breach of contract*, negligence along with other violations of Texas law. However, I am sure that an amicable resolution to this matter can be reached.

(Emphasis added). Because section 38.002 is to "be liberally construed to promote its underlying purpose," *see Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981), because no particular form of presentment of a claim is required, and because Head's May 30, 2002 letter informed PSI about a possible breach of contract action, PSI's presentment contention would fail even if it had been preserved. *See Llanes*, 133 S.W.3d at 641 (citing *Grace v. Duke*, 54 S.W.3d 338, 344 (Tex. App.–Austin 2001, pet. denied); *Carr v. Austin Forty*, 744 S.W.2d 267, 271 (Tex. App.–Austin 1987, writ denied)).

LEXIS 5027, at \*\*17-20 (Tex. App.–Corpus Christi June 29, 2010, pet. denied) (mem. op.).

## 2. Segregation of Attorney's Fees

With regard to the segregation of attorney's fees, PSI contends that it is entitled to a new trial because Head did not segregate attorney's fees with respect to each cause of action. Specifically, PSI alleges that Head is entitled to attorney's fees, if any, solely on his breach of contract action. Head asserts that his request for attorney's fees could not be segregated because the claims are inextricably "intertwined." Head notes that "the mere fact that Head also prosecuted tort claims for which attorney[']s fees are not recoverable, does not render the breach of contract attorney[']s fees incurred unrecoverable as well."

In support of its segregation argument, PSI directs us to the supreme court's decision in *Tony Gullo Motors*. *See* 212 S.W.3d at 314. In *Tony Gullo Motors*, the supreme court stated that the general rule for segregation of attorney's fees is that "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Id.* However, the supreme court further explained that:

> It is certainly true that Chapa's fraud, contract, and DTPA claims were all "dependent upon the same set of facts or circumstances," but that does not mean they all required the same research, discovery, proof, or legal expertise. Nor are unrecoverable fees rendered recoverable merely because they are nominal; there is no such exception in any contract, statute, or "the American Rule." To the extent *Sterling* suggested that a common set of underlying facts necessarily made all claims arising therefrom "inseparable" and all legal fees recoverable, it went too far.
>
> But *Sterling* was certainly correct that many if not most legal fees in such cases cannot and need not be precisely allocated to one claim or the other. *Many of the services involved in preparing a contract or a DTPA*

64

*claim for trial must still be incurred if tort claims are appended to it; adding the latter claims does not render the former services unrecoverable.* Requests for standard disclosures, proof of background facts, depositions of the primary actors, discovery motions and hearing, *voir dire* of the jury, and a host of other services may be necessary whether a claim is filed alone or with others. To the extent such services would have been incurred on a recoverable claim alone, they are not disallowed simply because they do double service.

. . . .

Intertwined facts do not make tort fees recoverable; it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated.

*Id.* at 313-14 (emphasis added).

In this case, PSI did not object to Head's alleged failure to segregate attorney's fees. If "no objection is made to the failure to segregate attorney['s] fees, either at the time evidence of attorney[']s fees is presented or at the time of the charge, the error is waived." *Holmes v. Concord Homes, Ltd.*, 115 S.W.3d 310, 313 (Tex. App.–Texarkana 2003, no pet.); *see* TEX. R. CIV. P. 274); *Solis*, 951 S.W.2d at 389; *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988); *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 705-06 (Tex. App.–Dallas 2008, no pet.); *Lesikar v. Rappeport*, 33 S.W.3d 282, 317 (Tex. App.–Texarkana 2000, pet. denied)); *see also Norrell v. Aransas County Navigation Dist. No. 1*, 1 S.W.3d 296, 303-04 (Tex. App.–Corpus Christi 1999, no pet.).

## B. Pre-Judgment Interest

With respect to its argument about pre-judgment interest, PSI asserts that Head was improperly awarded pre-judgment interest based on future damages and that the pre-judgment interest calculation does not comport with the time frame outlined in section 304.104 of the finance code. *See* TEX. FIN. CODE ANN. § 304.104 (West 2006).

65

We review a trial court's award of pre-judgment interest under an abuse of discretion standard. *See Morales v. Morales*, 98 S.W.3d 343, 348 (Tex. App.–Corpus Christi 2003, pet. denied); *see also Sw. Grain Co. v. Pilgrim's Pride S.A. de C.V.*, No. 13-07-00557-CV, 2010 Tex. App. LEXIS 5014, at *16 (Tex. App.–Corpus Christi June 28, 2010, pet. denied) (mem. op.). As noted earlier, a trial court abuses its discretion if it acted arbitrarily, unreasonably, or without reference to any guiding rules or principles. *See Downer*, 701 S.W.2d at 241-42; *see also Sw. Grain Co.*, 2010 Tex. App. LEXIS 5014, at *16.

Section 301.102 of the finance code authorizes an award of pre-judgment interest "in a wrongful death, personal injury, or property damage case." TEX. FIN. CODE ANN. § 304.102 (West 2006). Pre-judgment interest is measured from the "earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." *Id.* § 304.104. However, "[p]re-judgment interest may not be assessed or recovered on an award of future damages." *Id.* § 304.1045 (West 2006).

The final judgment recites that Head was awarded actual damages in the amount of $848,142.38. Pre-judgment interest accruing from May 9, 2002 through January 13, 2009, at a rate of 5% per annum, was awarded to Head for a total amount of $283,178.88 in pre-judgment interest. The final judgment does not segregate pre-judgment interest associated with past and future damages awarded. PSI does not challenge the sufficiency of the evidence supporting the amount of damages awarded, nor does it challenge the failure to segregate pre-judgment interest between past and future damages. Nevertheless, Head concedes that to the extent any pre-judgment

66

interest is attributed to future damages, we should modify the judgment to reflect only pre-judgment interest on past damages. *See Main Place Custom Homes, Inc. v. Honaker*, 192 S.W.3d 604, 628-29 (Tex. App.–Fort Worth 2006, pet. denied) (modifying a judgment to exclude $69,283 in pre-judgment interest that the trial court found to be attributable to future costs of repair). However, unlike *Honaker*, the record in this case does not contain any findings indicating how much of the pre-judgment interest is attributable to future damages. Of the $848,142.38 in actual damages awarded, $560,450, or approximately 66% of the damages award, constitutes future damages. If we were to subtract the future damages from the actual damages award, we would be left with $287,692.38 in past damages. It is this amount upon which pre-judgment interest should be based. *See* TEX. FIN. CODE ANN. § 304.1045; *see also Honaker*, 192 S.W.3d at 628-29.

In addition, we agree with PSI's argument that the time frame outlined in section 304.104 of the finance code was not properly applied in this case. We are not sure from where the May 9, 2002 date that serves as the starting point for pre-judgment interest calculations came. Based on our review of the record, it appears that Head first notified PSI of his potential claims on May 30, 2002. Moreover, Head did not file suit until February 13, 2008. In addition, the final judgment specifies that pre-judgment interest accrued from May 9, 2002 to the date the judgment was signed, January 13, 2009, a date that section 304.104 of the finance code excludes in the calculations of pre-judgment interest. *See* TEX. FIN. CODE ANN. § 304.104. Because there is a discrepancy between the dates the pre-judgment interest calculations should begin and end and because the trial court did not clearly specify the amount of pre-judgment interest

67

attributable to future damages, we believe that a remand is necessary for proper findings and recalculation of pre-judgment interest, if it is found to be necessary. *See Royal Maccabees Life Ins. Co. v. James*, 146 S.W.3d 340, 354 (Tex. App.–Dallas 2004, pet. denied) (remanding an award of pre-judgment interest to the trial court for recalculation); *see also Guerrero v. Salinas*, No. 13-05-323-CV, 2006 Tex. App. LEXIS 8562, at **48-49 (Tex. App.–Corpus Christi Aug. 10, 2006, no pet.) (mem. op.) (same). Accordingly, we sustain PSI's ninth issue.

## VI.    PROPORTIONATE RESPONSIBILITY

In its tenth issue, PSI alleges that the trial court improperly disregarded the jury's proportionate responsibility findings—that PSI was 75% responsible for the leak and Head was 25% responsible. Head responds that the jury's proportionate responsibility finding is immaterial because chapter 33 proportionate responsibility applies to only tort causes of action and Head elected to recover on, among other things, his breach of contract cause of action.

"A [jury] question is immaterial when it should not have been submitted, it calls for a finding beyond the province of the jury, such as a question of law, or when it was properly submitted but has been rendered immaterial by other findings." *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 172 (Tex. 1999) (citing *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994)). After the jury returned its verdict, Head elected to recover on his breach of contract, breach of implied warranty, fraud, and breach of fiduciary duty causes of action. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the

party has a right to a judgment on the theory entitling him to the greatest or most favorable relief."). However, neither the jury nor the trial court specified how the damages assessed corresponded to the causes of action upon which Head elected to recover. Citing *Garza*, PSI argues that the "jury's allocation of responsibility to Head is supported by considerable evidence that Head failed to properly inspect and monitor his diesel storage system." 257 S.W.3d at 704-05. We concluded earlier that the evidence supporting Head's breach of contract claim is sufficient. Therefore, because the damages award could be premised on Head's breach of contract claim, a claim in which the doctrine of proportionate responsibility does not apply, we conclude that the trial court properly disregarded the jury's proportionate responsibility findings as immaterial. *See Tichacek*, 997 S.W.2d at 172; *Spencer*, 876 S.W.2d at 157; *see also Doncaster*, 161 S.W.3d at 604. Accordingly, we overrule PSI's tenth issue.

## VII.    OVERLAPPING DAMAGES

By its eleventh issue, PSI contends that it is entitled to a new trial because the trial court erroneously refused to instruct the jury on overlapping damages. PSI asserts that the trial court should have instructed the jury that "you shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss." According to PSI, the failure to give this instruction "probably caused the rendition of an improper judgment by allowing the jury to award a double recovery or probably prevented PSI from properly presenting its case to this Court by preventing PSI from demonstrating the existence of a double recovery." Head argues that PSI's sole authority for this argument, the supreme court's decision in *Golden Eagle Archery, Inc v. Jackson*, 116 S.W.3d 757 (Tex. 2003), is inapplicable.

69

Head also argues that PSI's argument that there was a potential for overlapping damages is not enough to warrant a new trial. Moreover, Head counters that PSI failed to establish a double recovery or that it was harmed by the trial court's submission.

In *Golden Eagle Archery*, a personal-injury case, the supreme court was tasked to resolve how courts of appeals should conduct a factual sufficiency review when "(1) a jury is permitted to award damages for elements that somewhat overlap, (2) the jury is instructed not to duplicate an award for any particular loss, and (3) the jury awards no damages or damages that are allegedly inadequate for an element that could overlap with another." *Id.* at 758. The evidence presented at trial in *Golden Eagle Archery* pertained to more than one category of damages—physical pain and mental anguish, "physical impairment of loss of vision," and "physical impairment other than the loss of vision." *Id.* at 760. The jury was instructed to "[c]onsider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element." *Id.* at 762. The jury declined to find that the product involved in the incident was defectively designed; however, it did find that the manufacturer failed to give adequate warnings about the product's danger. *Id.* The jury ultimately awarded damages on several grounds, and Jackson complained that the damages overlapped, especially with respect to the physical impairment causes of action. *Id.* at 760-61. In analyzing Jackson's complaints about the jury charge, the supreme court noted that defining damage categories for juries in such a way that they do not overlap may not be feasible for some damage elements. *Id.* The court further noted that:

> The charge in this case permitted the jury to award separate
> amounts of damages in six different categories. The standard of review to

70

determine factual sufficiency of the evidence that we set forth today differs from the standard of review that is applied when the jury is asked to award a single amount of damages, but is told that it may consider various elements in arriving at that amount. In the latter circumstance, we have held that a challenge must address all the elements that could have been considered by the jury in making its total, single-amount award. "If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence."

In the case before us, the jury had six blanks to fill and was instructed not to award damages for the same element more than once. Unless the record demonstrates otherwise, an appellate court must presume that the jury followed these instructions. In conducting its factual sufficiency review, the court of appeal should presume that the jury did not award damages to Jackson for any element more than once, unless the record demonstrates otherwise.

*Id.* at 770-71 (internal citations & footnotes omitted). Ultimately, the court concluded that the submission of both "physical impairment of loss of vision" and "physical impairment other than loss of vision" as separate damage items was not erroneous. *Id.* at 776. Moreover, the court stated that Golden Eagle Archery had failed to demonstrate how it was harmed by such a submission. *Id.*

As was the case in *Golden Eagle Archery*, the trial court in this case followed the State Bar of Texas Pattern Jury Charge to some extent. *See id.* at 770 (citing Tex. Pattern Jury Charges PJC 8.2 (2000 ed.)). Moreover, the instructions contained in the charge in this case are substantially similar to those contained in the charge submitted in *Golden Eagle Archery*. *See id.* at 762. In fact, the jury in this case was repeatedly instructed to "[c]onsider the following elements of damages, if any, and none other." With respect to the damages questions upon which PSI complains, the jury was specifically instructed as follows:

Do not reduce the amount, if any, in your answer because of the negligence, if any, of Bill Head d/b/a Bill Head Enterprises. Do not include interest in any amount of damages you find.

71

Do not include in your answer any amount that you find Bill Head d/b/a Bill Head Enterprises could have avoided by the exercise of reasonable care. Consider the following elements of damages, if any, and none other.

The jury then answered the damage question by awarding the following amounts:

| | |
|---|---|
| Cost of the installation of the Underground Storage Tank system in 1996-97. | $ 0 |
| Cost of the tank hole liner in 1997. | $ 0 |
| Attorney's fees for the defense of the Enforcement Action. | $ 47,749.88 |
| Cost of emergency clean-up of the release discovered in November 2001. | $ 94,127.50 |
| Cost of past remediation of the Silver Spur site. | $ 108,315.00 |
| Cost of future remediation of the Silver Spur site. | $ 560,450.00 |
| Value of lost diesel as a result of the release discovered in November 2001. | $ 30,000.00 |
| Cost of automatic tank gauge/leak detection system installed in 1999. | $ 7,500.00 |
| Amount of the TNRCC fine. | $ 0 |

Clearly, the jury in this case was instructed to consider each damage element separately, as the jury in the *Golden Eagle Archery* case was instructed to do. *See id.* at 770-71. Moreover, we are to presume the jury in this case followed the instructions provided and did not award Head damages for any element more than once, unless the record indicates otherwise; it does not here. *See id.* at 771; *see also Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 862 (Tex. 2009) ("The jury is presumed to have followed the court's instructions."); *Sanchez v. Excelo Bldg. Maint.*, 780 S.W.2d 851, 854 (Tex. App.–San Antonio 1989, no writ) (same). PSI has not

shown how it was harmed by the trial court's submission, other than speculating hypothetically.

Based on our review of the record, we do not find any evidence to suggest that the jury awarded Head overlapping damages or, in other words, provided Head with a double recovery. As such, we cannot say that PSI has demonstrated an entitlement to a new trial based upon overlapping damages. Accordingly, we overrule PSI's eleventh issue.

## VIII. PSI's CONTRACT CLAIMS AGAINST HEAD

In its thirteenth issue, PSI argues that it is entitled to the rendition of judgment on its contract claims against Head because there is no evidence to support the estoppel defense raised by Head. Specifically, PSI challenges that the jury's finding that Head's failure to pay PSI for its services was excused.

The jury found that Head failed to comply with his agreement to pay PSI for materials and services provided and concluded that $57,527.49 would be fair compensation for PSI as a result of the breach. However, the jury also concluded that Head's failure to comply was excused. The charge stated that Head's failure to comply was excused if:

1. Petroleum Solutions, Inc.

   a. by words or conduct made a false representation or concealed material facts,

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. [w]ith the intention that Bill Head d/b/a Bill Head Enterprises would rely on the false representation or concealment in action or deciding not to act; and

73

2. Bill Head d/b/a Bill Head Enterprises

    a. did not know and had no means of knowing the real facts and

    b. relied to his detriment on the false representation or concealment of material facts.

In arguing that he was excused from paying PSI for the invoices presented for repairs to the systems from 1997 to 2001, Head relied on the doctrine of estoppel. As PSI notes, the "burden of proving estoppel and the essential elements thereof is on the party asserting it and the failure to prove any one or more of the elements is fatal." *Barfield v. Howard M. Smith Co. of Amarillo*, 426 S.W.2d 834, 838 (Tex. 1968). The supreme court further noted that "the party asserting an estoppel must establish that he relied on the misleading conduct to his detriment." *Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 833 (Tex. 1967). However, we concluded earlier that the record contains more than a scintilla of evidence to support the jury's fraud finding that Head relied on the numerous false representations made by PSI, including the functionality of the systems, inventory recordkeeping, and the cause of the leak, and suffered a detriment in the amount of approximately $1 million in fines, costs, attorney's fees, and expenses. *See City of Keller*, 168 S.W.3d at 810; *see also Barfield*, 426 S.W.2d at 838; *Tyra*, 419 S.W.2d at 833. Because PSI's numerous representations caused Head damages, we conclude that the evidence is sufficient to support the jury's finding that Head was excused from performing under the agreements. *See Barfield*, 426 S.W.2d at 838; *see also Tyra*, 419 S.W.2d at 833. Accordingly, we overrule PSI's thirteenth issue.

## IX. TITEFLEX'S CAUSES OF ACTION

74

In its twelfth issue, PSI argues that Titeflex was not entitled to indemnification as a matter of law because: (1) PSI is not a manufacturer under section 82.002(a) of the civil practice and remedies code, *see* TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(a); (2) Titeflex was not sued as an innocent seller of PSI's product; (3) Head's claims fail; (4) Titeflex's indemnity claims do not constitute a "product liability action" and Titeflex did not segregate its attorney's fees; and (5) if the underground storage tank system is considered a "product," then PSI is entitled to a new trial. Titeflex counters that: (1) the fact that the underground storage tank system can be considered an "improvement" to real property does not preclude a products liability action, nor the applicability of chapter 82 of the civil practices and remedies code; (2) PSI is a manufacturer and its duty to indemnify Titeflex was triggered by the allegations contained in Head's pleadings, not the outcome of the case; (3) the jury properly concluded that Titflex was an innocent seller; (4) the trial court properly concluded that Titeflex was entitled to indemnity from PSI for attorney's fees, expenses, and reasonable costs assessed by the jury; and (5) PSI is not entitled to a new trial based on any contention that it was not permitted to allocate blame to Titeflex.

## A. Applicable Law

Section 82.002 of the civil practice and remedies code provides the following, in relevant part:

> (a)    A manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action, except for any loss caused by the seller's negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable.
>
>       . . . .

(g)        A seller is entitled to recover from the manufacturer court costs and other reasonable expenses, reasonable attorney's fees, and any reasonable damages incurred by the seller to enforce the seller's right to indemnification under this section.

*Id.* § 82.002(a), (g).  Section 82.001 defines a "[p]roducts liability action" as:

any action against a manufacturer or seller for recovery of damages arising out of personal injury, death, or property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories.

*Id.* § 82.001(2) (West 2011).  On the other hand, a "[s]eller" is defined as "a person who engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof."  *Id.* § 82.001(3).  Section 82.001 defines a manufacturer as "a person who is a designer, formulator, constructor, rebuilder, fabricator, producer, compounder, processor, or assembler of any product or any component part thereof and who place the product or any component part thereof in the stream of commerce."  *Id.* § 82.001(4).

## B. Discussion

As noted above, the jury concluded that PSI was a manufacturer and that Titeflex was a seller within the context of chapter 82 of the civil practice and remedies code.  *See id.* § 82.001(3)-(4).  Though they were not specifically asked to determine whether PSI had a duty to indemnify Titeflex, the jury, by awarding Titeflex $382,334 in reasonable attorney's fees and $68,519.62 in expenses, implicitly concluded that Head's claims arose out of a products liability action and that PSI was required to indemnify and hold harmless Titeflex for losses arising from Head's claims.  *See id.* §

76

82.002(a), (g). The trial court, in its final judgment, noted that Titeflex was an innocent seller. Further, the trial court awarded Titflex $12,393.25 in court costs.

### 1. Mixed Questions of Law and Fact

As a threshold matter, PSI argues that the jury's conclusions regarding manufacturer and seller statuses under chapter 82 of the civil practice and remedies code are immaterial because such determinations are questions of law. To support this contention, PSI cites to the supreme court's decision in *Fitzgerald v. Advanced Spine Fixation Systems, Inc.*, 996 S.W.2d 864, 867 (Tex. 1999). We do not find the *Fitzgerald* case supportive of PSI's contention.

In *Fitzgerald*, the supreme court analyzed an argument made by a manufacturer "that the Legislature intended to deny indemnification to sellers who are not in the chain of distribution from the manufacturer to the injured plaintiff." *Id.* at 865. Specifically, the manufacturer contended "that prior case law and legislative history demonstrate that the Legislature's purpose [in enacting section 82.002(a) of the civil practice and remedies code] was to codify some aspects of our [the supreme court's] decisions and overrule others, resulting in indemnity only for those seller in the chain of marketing or distribution of the defective product from the manufacturer to the injured plaintiff." *Id.* The supreme court analyzed the construction of section 82.002(a) and concluded that the manufacturer's argument conflicted with the intent of the Legislature. *Id.* at 867. The court held that the unambiguous language of the statute did not require that a seller be proved to have been in the specific chain of distribution; based on this interpretation of the statute, the court implicitly concluded that the seller, Fitzgerald, was entitled to indemnification from the manufacturer. *Id.* at 867, 869.

77

In this case, the parties do not contend that section 82.002(a) is ambiguous; they do not advance a novel interpretation of section 82.002(a); and the analysis of this issue does not require resorting to the rules of statutory construction. Instead, our analysis of PSI's arguments in this issue involves mixed questions of law and fact or, in other words, an application of law to the facts. *See Mega Child Care, Inc. v. Tex. Dep't of Protective & Regulatory Servs.*, 29 S.W.3d 303, 309 (Tex. App.–Houston [14th Dist. 2000] 2000) ("An issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard."), *aff'd*, 145 S.W.3d 170 (Tex. 2004); *see also Tex. State Secs. Bd. v. Miller*, No. 03-06-00365-CV, 2009 Tex. App. LEXIS 5108, at *10 (Tex. App.–Austin July 1, 2009, no pet.) (mem. op.). In determining whether PSI is a manufacturer and whether Titeflex is an innocent seller, we must necessarily examine the evidence adduced at trial and cannot make a determination solely by reference to the law. *See Mega Child Care, Inc.*, 29 S.W.3d at 309; *see also Miller*, 2009 Tex. App. LEXIS 5108, at *10. Moreover, the trial court, in its final judgment adopting the jury's findings, ostensibly concluded as a matter of law that PSI was a manufacturer and that Titeflex was an innocent seller under section 82.001 of the civil practice and remedies code. We, therefore, reject PSI's contention that the jury's answers regarding the statuses of PSI and Titeflex are immaterial. In any event, we defer to the fact-finder's factual determinations if they are supported by the evidence and review its legal determinations de novo. *Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999), *overruled on other grounds by Martin v. Amerman*, 133 S.W.3d 262 (Tex. 2004).

## 2. Whether the Underground Storage Tank System Was an Improvement to Real Property That Was Not Placed in the Stream of Commerce

78

Next, PSI argues that it is not a manufacturer because the underground storage tank system was an improvement to real property that was not placed in the stream of commerce. Essentially, PSI challenges the characterization of the underground storage tank system as a product placed into the stream of commerce in accordance with chapter 82. PSI relies heavily on the holdings in *Sonnier v. Chisholm-Ryder Co.*, 909 S.W.2d 475, 479 (Tex. 1995); *Barbee v. Rogers*, 425 S.W.2d 342, 346 (Tex. 1968); *Palmer v. Espey Huston & Associates, Inc.*, 84 S.W.3d 345, 356 (Tex. App.–Corpus Christi 2002, pet. denied); *Cecil v. T.M.E. Investments, Inc.*, 893 S.W.2d 38, 51 (Tex. App.–Corpus Christi 1994, no pet.); and *Hanselka v. Lummus Crest, Inc.*, 800 S.W.2d 665, 666 (Tex. App.–Corpus Christi 1990, no writ). PSI asserts that these cases stand for the proposition that, as a matter of law, an underground storage tank system is not a product in the stream of commerce. Titeflex argues that an improvement to real property can still be considered a product within the context of chapter 82.

In *Sonnier*, the supreme court addressed the applicability of the statute of repose stated in section 16.009 of the civil practice and remedies code. 909 S.W.2d at 479. The *Sonnier* court distinguished between: (1) manufacturers of property who craft a product that a third party later attaches to real property, thereby converting the product into an improvement; and (2) manufacturers who actually work to attach the personalty directly to the real property. *Id.* The *Sonnier* court specifically mentioned when "an attachment of personalty to realty becomes an improvement." *Id.* Citing to *Logan v. Mullis*, 686 S.W.2d 605, 607 (Tex. 1985), the *Sonnier* court stated three factors that are relevant in determining whether personalty has become a permanent attached to realty: (1) the mode and sufficiency of annexation, either real or constructive; (2) the

79

adaptation of the personalty to the use or the purpose of the realty; and (3) the intention of the owner who causes the personalty to be attached to the realty. *Id.* "The owner's intent is critical because personalty does not constitute an improvement until it is annexed to realty. To constitute an improvement there must be a joinder of personalty with realty." *Id.* Regardless of whether the underground storage tank system constitutes a permanent fixture to realty, the *Sonnier* court did not explicitly state that an improvement to real property cannot also be a product under chapter 82 of the civil practice and remedies code; instead, the court analyzed whether the statue of repose precluded suit. *Id.* at 483 ("Absent any evidence that Chisholm did more, we conclude that Chisholm did not construct an "*improvement to real property" as contemplated by section 16.009.*") (emphasis added).

PSI cites the *Barbee* case for the contention that the underground storage tank system installed at Head's truck stop was "not a finished product offered to the general public in regular channels of trade." *See* 425 S.W.2d at 346. With respect to the nature of the appellate complaints, the *Barbee* court noted that:

> Respondents and the licensed optometrists in their employ exercise skill and judgment in the examination, prescription[,] and fitting process[,] whereby it is sought to remedy visual abnormalities by the use of curved lenses or prisms. The failure here is not attributable to the product itself, i.e., the contact lenses, but to the professional and statutorily authorized act of "measuring the powers of vision" of Petitioner's eyes and "fitting lenses . . . to correct or remedy . . . [his] defect or abnormal condition of vision." This is not the act of one selling a "product in a defective condition unreasonably dangerous to the user" in the terms of the Torts Restatement. It is the act of one deemed in law to have the competence to remedy a visual defect by furnishing particularly prescribed contact lenses.

*Id.*

80

In this case, Titeflex was sued on the theory of strict liability for allegedly providing a defective flex connector to the system that PSI assembled and installed. Because the *Barbee* case did not address indemnification or involve products "in a defective condition unreasonably dangerous to the user," which served as the basis of the complaints against Titeflex, we do not find the *Barbee* case to be persuasive in this matter.

In *Palmer*, this Court addressed complaints pertaining to a breakwater in a marina. *See* 84 S.W.3d at 349. Appellants brought suit after "a series of storms with prevailing northerly winds generated waves which overtopped or went under the breakwater and caused damage to the docks and boats inside the marina." *Id.* We specifically noted that the design of the breakwater was done by a professional architectural, engineering, and planning firm and that appellants' complaints centered "on the design of the breakwater, not the construction of the breakwater or the provisions of the parts thereof." *Id.* at 349, 356. In determining whether the trial court erred in granting appellees' motions for directed verdict, we noted that the breakwater was not movable because it was a permanent improvement to the real estate and ultimately concluded, for strict liability purposes, that the breakwater was not put into the stream of commerce. *Id.* at 356.

PSI's reliance on the *Palmer* case is unfounded for several reasons. First, the *Palmer* Court did not address the applicability of the indemnity provisions contained in chapter 82 of the civil practice and remedies code, nor did the *Palmer* appellants assert a right to indemnification or that the construction or usage of parts was problematic; instead, we addressed appellants' design complaints. Second, the *Palmer* Court

81

emphasized that the breakwater was not movable and, thus, was not placed in the stream of commerce. *Id.* Here, Barron testified that PSI is in the business of assembling and installing underground storage tank systems and that each of the double-walled, fiberglass storage systems is essentially the same for all of PSI's customers. Barron's testimony undermines PSI's contention on appeal that "the underground storage system was 'designed in the light of [Head's] particular needs.'" *See Barbee*, 425 S.W.2d at 346. Moreover, the system at issue in this case is certainly movable and was attached to realty, especially considering that the prior system, which was similar to PSI's system, was removed from the premises and pieces of PSI's system were removed for testing or replacement.

In *Cecil*, the trial court granted a directed verdict in favor of a company that designed an Executive Health Spa pool. 893 S.W.2d at 50. The plaintiff complained that the company's design of the pool was defective. *Id.* Essentially, the case pertained to the company's manufacturing and installation of coping stones as a border around the pool. The plaintiff complained that the coping-stone tiles were too slippery and improperly installed on top of pre-existing tiles, creating an uneven surface that caused the plaintiff to lose her balance as she walked along the pool side. *Id.* at 42. This Court affirmed the trial court's directed verdict, concluding that the plaintiff had not raised an evidentiary dispute regarding the company's knowledge of any danger in the design of the pool. *Id.* at 51. Our ruling was not based on whether the coping stones were products or whether the coping stones had been placed in the stream of commerce. With respect to a concurrent marketing-defect claim brought by the plaintiff, the *Cecil* Court concluded that there was no "evidence that the coping stones were unreasonably

82

dangerous or that the absence of accompanying instruction or warnings caused Cecil's injury." *Id.* at 50. Based on our review of the case, we do not believe that the *Cecil* case supports PSI's inference that a swimming pool, much less an underground storage tank system, is not a product in the stream of commerce.[28]

Finally, PSI cites to our decision in the *Hanselka* case, which involved complaints pertaining to sludge disposal system designed for waste-water disposal unit. 800 S.W.3d at 666. An employee of a needle coke plant fell and injured her back while climbing on a ladder welded to a platform erected over a dumpster that contained sludge. *Id.* This Court concluded that the claims brought by the employee pertained to the design of the factory, which required the application of the principles of ordinary negligence. *Id.* We noted that "[t]his is not a product defect case in which, because products have been put into the stream of commerce, strict liability applies." *Id.* Essentially, we concluded that a factory is not a product placed in the stream of commerce. *See id.* PSI compares the factory and sludge disposal system in the *Hanselka* case to the underground storage tank system in this case and argues that the underground storage tank system was not placed in the stream of commerce.

---

[28] The *Cecil* court did note, however, that any error in the design of the coping stones would raise strict liability issues, but errors in the design of the pool must be addressed under theories of negligence. *Cecil v T.M.E. Invs., Inc.*, 893 S.W.2d 38, 51 (Tex. App.–Corpus Christi 1994, no pet.) (citing *Wochner v. Johnson*, 875 S.W.2d 470, 475-77 (Tex. App.–Waco 1994, no writ) (distinguishing between negligence and strict liability in a suit against the seller of materials and plans for the construction of a home); *Hanselka v. Lummus Crest, Inc.*, 800 S.W.2d 665, 666 (Tex. App.–Corpus Christi 1990, no writ) (concluding that a cause of action based on the flawed design of a factory lies in negligence rather than strict liability); *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 472-73 (Tex. App.–Texarkana 1981, writ ref'd n.r.e.) (holding that absent proof of a design defect involving roofing products, a roofing manufacturer might be held liable only under negligence theories)). However, a negligence claim that is properly joined with a products liability claim is to be considered part of the products liability action in terms of a manufacturer's duty to indemnify an innocent seller, and the manufacturer is required to indemnify the seller for any loss arising out of the action, except when there is a finding that the seller independently caused the loss. *Toyota Indus. Equip. Mfg. v. Carruth-Doggett, Inc.*, 325 S.W.3d 683, 690-91 (Tex. App.–Houston [1st Dist.] 2010, pet. filed) (citing *Meritor Automotive, Inc. v. Ruan Leasing Co.*, 44 S.W.3d 86, 87 (Tex. 2001)).

We disagree that the factory and the underground storage tank system in this case are similar. As previously mentioned, Barron testified that PSI assembles and installs underground storage tank systems and that the each system is usually identical or substantially similar to others assembled and installed. PSI markets itself as an assembler and installer of underground storage tank systems. Unlike the underground storage tank system in this case, the platform over the dumpster in the *Hanselka* case appears to be unique to the customer and not something that is regularly sold to numerous customers. *See id.* As such, we conclude that the *Hanselka* case is factually distinguishable.

The supreme court has recently addressed, within the context of chapter 82, whether synthetic stucco attached to a real property, a house, constituted a product to which products-liability law applied. *See Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 895 (Tex. 2010). The *Fresh Coat* court held that:

> Under K-2's definition of product, products that become part of homes cannot be the subject of indemnity claims by homebuilders and their contractors if those homebuilders and contractors are sued by homeowners. Instead, K-2 claims that products placed into the stream of commerce are not products once they become integrated into a house, which is real property, even if they were products for all purposes beforehand. We agree with the court of appeals that Chapter 82 contains no such limitation.
>
> . . . .
>
> From that definition, a product is something distributed or otherwise placed, for any commercial purpose, into the stream of commerce for use or consumption.
>
> We hold that the EIFS provided by Fresh Coat was a "product" as that word is used in the text of Chapter 82.[29]

---

[29] The *Fresh Coat* Court noted that EIFS "is a synthetic stucco system made of component parts manufactured by [K-2]." *Fresh Coat, Inc. v. K-2, Inc.*, 318 S.W.3d 893, 897 (Tex. 2010).

84

*Id.* at 897; *see* BLACK'S LAW DICTIONARY 1245 (8th ed. 2004) (defining a "product" as "[s]omething that is distributed commercially for use or consumption and that is usu[ally] (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption"); *see also* RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 19 (1998) ("A product is tangible personal property distributed commercially for use or consumption. Other items, such as real property and electricity, are products when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property . . . .").

In addition, the *Fresh Coat* Court cited to other Texas cases in which Texas products-liability law applied to subcomponents of homes or, in other words, products affixed to real property. 318 S.W.3d at 899 n.8 (citing *Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd.*, 848 S.W.2d 724, 731-32 (Tex. App.–Dallas 1992, writ denied) (treating fiberboard as a product for purposes of products-liability claims); *Bennett v. Span Indus., Inc.*, 628 S.W.2d 470, 472 (Tex. App.–Texarkana 1981, writ ref'd n.r.e.) (noting that has there been a defect in a component installed in a building, that defect might have supported a legitimate claim under products-liability law); *Cupples Coiled Pipe, Inc. v. Esco Supply Co.*, 591 S.W.2d 615, 615-16, 618 (Tex. Civ. App.–El Paso 1979, writ ref'd n.r.e.); *Hovenden v. Tenbush*, 529 S.W.2d 302, 305-06 (Tex. Civ. App.–San Antonio 1975, no writ) (treating used bricks in a building as defective products after walls made with the bricks deteriorated)). Following the analysis conducted by the *Fresh Coat* Court, we reject PSI's contention that the attachment of the underground storage tank system to real property prevented it from

85

being considered product placed into the stream of commerce within the context of chapter 82. *See Fresh Coat, Inc.*, 318 S.W.3d at 897, 902 ("Chapter 82's text does not limit "product" to exclude items that may later become part of a house wall.").

### 3. Whether PSI is a Manufacturer Under Section 82.001(4)

As noted above, section 82.002(a) provides that a manufacturer shall indemnify and hold harmless an innocent seller against loss arising out of a products liability action. TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(a). Relying on the plain language of section 82.001(4) and the supreme court's decision in *General Motors Corp. v. Hudiberg Chevrolet, Inc.*, 199 S.W.3d 249, 256-57 (Tex. 2006), Titeflex contends that PSI is a manufacturer. Section 82.001(4) defines a manufacturer as, among other things, a "designer . . . constructor, rebuilder, fabricator, producer . . . or assembler" of any product that is placed in the stream of commerce. TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(4). In *Hudiberg*, the supreme court noted that "all manufacturers are also sellers, but not all sellers are manufacturers" and that:

> Under the statute . . . the manufacturer of a component product alleged by a claimant to be defective has a duty to indemnify an innocent seller/manufacturer of a finished product which incorporates the component from loss arising out of a products liability action related to the alleged defect, but the manufacturer of an allegedly defective finished product has a duty to indemnify the innocent seller/manufacturer of a component product for the same loss.

199 S.W.3d at 256-57. Here, several witnesses testified that PSI designs, assembles, and installs underground storage tanks for customers and that such actions are integral to PSI's business. Witnesses also testified that PSI creates design plans with a listing of component parts to be incorporated into the system. Titeflex's expert, Dr. Pinkston, testified that, based on his extensive experience and his review of the record, the

86

underground storage tank system in this case is a product and that PSI is a manufacturer because it designs, assembles, and installs the systems for customers. On appeal, PSI argues that Dr. Pinkston's testimony should be disregarded because his testimony is conclusory, and he is not qualified to testify about a purely legal question.

First, we note that PSI did not object at trial to Dr. Pinkston's qualifications, his methodology, or his ability to testify about the issues in this case. To the extent that PSI objects to Dr. Pinkston's qualifications on appeal, we conclude that such arguments have been waived. *See Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 769 n.11 (Tex. 2007) ("We note initially that Borg-Warner did not challenge, either before trial or at the time the evidence was offered, the reliability of Flores's experts and has, therefore, waived any reliability challenge that would require us to evaluate the experts' underlying methodology, technique, or foundational data.") (citing *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 231-33 (Tex. 2004)). Second, as we concluded earlier, whether PSI is a manufacturer and whether Titeflex is an innocent seller are mixed questions of law and fact. An expert witness may state an opinion on mixed questions of law and fact. *See In re Christus Spohn Hosp. Kleberg*, 222 S.W.3d 434, 440 (Tex. 2007); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 365 (Tex. 1987) ("Fairness and efficiency dictate that an expert may state an opinion on a mixed question of law and fact as long as the opinion is confined to the relevant issues and is based on proper legal concepts."); *Louder v. DeLeon*, 754 S.W.2d 148, 149 (Tex. 1988). Therefore, in reviewing the evidence in the light most favorable to the jury's findings, we conclude that a rational juror, based on the plain language of section 82.001(4) and the abundance of relevant evidence in the record, could have concluded

that PSI is a manufacturer under section 82.001(4). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(4); *see also Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008); *Brainard*, 12 S.W.3d at 30.

### 4. Whether Titeflex is an Innocent Seller Under Section 82.001(3)

A seller under section 82.001(3) of the civil practice and remedies code is an entity "engaged in the business of distributing or otherwise placing, for any commercial purpose, in the stream of commerce for use or consumption a product or any component part thereof." TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(3). "Anyone who qualifies as a 'seller' may seek indemnification, subject to the limitations of section 82.002(a)." *Fitzgerald*, 996 S.W.2d at 867. The limitation of section 82.002(a) is that the seller must be innocent of any "negligence, intentional misconduct, or other act or omission, such as negligently modifying or altering the product, for which the seller is independently liable." TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(a); *see Owens & Minor, Inc. v. Ansell Healthcare Prods., Inc.*, 251 S.W.3d 481, 482 (Tex. 2008).

The record reflects that Titeflex makes and sells a type of flex connector that is a component part in a finished underground storage tank system. In fact, Barron certified to the TRNCC and testified at trial that the alleged faulty flex connector in this case was manufactured and sold by Titeflex, though Barron's assertions were hotly disputed. PSI was unable to produce the faulty flex connector that was removed from Head's underground storage tank system; and Barron was unable to produce handwritten notes that he alleged described the faulty flex connector as having been manufactured and sold by Titeflex. Pictures of the faulty flex connector were admitted at trial, and experts described the flex connector as having been manufactured and sold by Resistoflex.

Nevertheless, both PSI and Head sued Titeflex, based on PSI's assertions that the cause of the leak was the flex connector manufactured and sold by Titeflex. Later, Head discovered that there was no evidence indicating that Titeflex was at fault; thus, Head non-suited his claims against Titeflex. It was not until much later did PSI non-suit its third-party claims against Titeflex, only after PSI failed to produce the alleged faulty flex connector, Barron's handwritten notes, and Dr. Corneilissen's expert testimony on Titeflex's purported liability in the case. Essentially, other than Barron's own statements, there is no evidence that Titeflex was at fault for the leak, a contention that is supported by the fact that all claims against Titeflex were eventually non-suited. The jury ultimately concluded that Titeflex was a seller, and the trial court, in its final judgment, specifically noted that Titeflex was an innocent seller within the context of chapter 82.

Viewing the evidence is the light most favorable to the jury and the trial court's findings, we conclude that a rational fact-finder, based on the plain language of section 82.001(3) and the abundance of relevant evidence in the record, could have concluded that Titeflex is an innocent seller under section 82.001(3). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(3); *see also Hogue*, 271 S.W.3d at 248; *Brainard*, 12 S.W.3d at 30.

### 5. Product Liability Actions

Despite having concluded that PSI is a manufacturer and Titeflex is a seller under chapter 82, we must now determine whether the underlying causes of action against Titeflex were products liability actions entitling Titeflex to indemnification. Section 82.001(2) of the civil practice and remedies code defines a "[p]roducts liability action" as "any action against a manufacturer or seller for recovery of damages arising

89

out of . . . property damage allegedly caused by a defective product whether the action is based in strict tort liability, strict products liability, negligence, misrepresentation, breach of express or implied warranty, or any other theory or combination of theories." TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(2); *see JCW Elecs., Inc. v. Garza*, 257 S.W.3d 701, 705 (Tex. 2008); *see also HCA Health Servs. of Tex., Inc. v. Danek Med., Inc.*, No. 13-03-00556-CV, 2005 Tex. App. LEXIS 8408, at **5-7 (Tex. App.–Corpus Christi Oct. 13, 2005, no pet.) (mem. op.).

In its third-party action against Titeflex, PSI alleged the following:

> The underground flex connector was defective to such a degree as to render it unreasonably dangerous, and it reach[ed] Petroleum Solutions, without substantial change in its condition from the time it was originally sold. The defect cause[d] the changes alleged by Plaintiff [Head]. Therefore, Titeflex is *strictly liable under products liability law* . . . . Titeflex is strictly liable to Petroleum Solutions, and the plaintiff for his injuries, damages, if any, *under products liability law*.

(Emphasis added.) Like PSI, Head also alleged a products-liability action against Titeflex: "As stated in the third[-]party action, Petroleum Solutions purchased the underground flex connector from Titeflex. Titeflex manufactured the flex connector. Titeflex is strictly liable for damages caused by the defective flex connector."

In *Meritor Automotive, Inc. v. Ruan Leasing Co.*, the supreme court held that "the manufacturer's duty to indemnify the seller is invoked by the plaintiff's pleadings and joinder of the seller as defendant." 44 S.W.3d 86, 91 (Tex. 2001); *see Hudiberg Chevrolet, Inc.*, 199 S.W.3d at 256 ("The duty to indemnify is triggered by the injured claimant's pleadings."); *see also Owens & Minor, Inc.*, 251 S.W.3d at 484. Thus, we look to Head's pleadings to determine whether PSI, the manufacturer, had a duty to indemnify Titeflex, the innocent seller. *See Equitable Recovery, L.P. v. Health Ins.*

90

*Brokers of Tex., L.P.*, 235 S.W.3d 376, 387 (Tex. App.–Dallas 2007, pet. denied) ("Contribution and indemnity are methods by which the burden of paying damages to a plaintiff is shifted from one defendant to another, both of whom are jointly liable to the plaintiff on the same claim. It follows that no right of contribution or indemnity exists unless the plaintiff *has* a claim against the co-liable parties. In other words, contribution and indemnity are not independent claims but are "derivative" of the plaintiff's claims against each co-liable party. There can be no contribution or indemnity between two parties based on a direct claim between them.") (emphasis in original) (citations omitted).

Based on our reading of section 82.001(2) and related case law, we conclude that the claims brought against Titeflex constituted products-liability actions and because Titeflex was an innocent seller, it was entitled to indemnification from PSI, the manufacturer. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.001(2); *Garza*, 257 S.W.3d 701, 705 (Tex. 2008); *see also Danek Med., Inc.*, 2005 Tex. App. LEXIS 8408, at **5-7.

### 6. The Relationship Between Titeflex's indemnification Claims and Head's Claims Against PSI

Nevertheless, PSI argues that Titeflex's indemnification claims should fail because Head's claims against PSI fail. First, we have already affirmed the jury's conclusions as to Head's claims against PSI. Second, section 82.002(e)(1) provides that a manufacturer's duty to indemnify an innocent seller "applies without regard to the manner in which the action is concluded." TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(e)(1); *see Owens & Minor, Inc.*, 251 S.W.3d at 483 ("Thus, under Section 82.002, the manufacturer is now liable to the seller regardless of how the injury action is resolved."); *see also Hudiberg Chevrolet, Inc.*, 199 S.W.3d at 255 ("However, the duty

to indemnify does not depend on an adjudication of the *indemnitor's* liability, as it does under the common law. This follows from section 82.001(e)(1), which states that 'the duty to indemnify under this section . . . applies without regard to the manner in which the action is concluded"—whether by judgment, settlement, or dismissal.") (emphasis in original) (footnote omitted). Thus, we reject PSI's contention that Titeflex's claims should fail because Head's claims fail, because the resolution of Head's claims is irrelevant to the analysis of Titeflex's indemnification claims.

### 7. The Segregation of Titeflex's Attorney's Fees

PSI also argues that there is legally insufficient evidence of Titeflex's segregated attorney's fees and expenses. Specifically, PSI alleges that Titeflex's recovery of $450,853.62 (the sum of the reasonable attorney's fees and expenses awarded by the jury) "cannot be upheld as a 'loss arising out of a product liability action.'" *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(a). PSI also contends that Titeflex "was required to segregate out the fees associated with its defense of PSI's claim for contribution and indemnity, and the fees associated with its defense of plaintiff's [Head's] claims against it as the manufacturer of the Titeflex flex connector." *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). Titeflex asserts that there is sufficient evidence in the record to demonstrate that PSI was required to indemnify Titeflex for court costs, reasonable attorney's fees, and expenses. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(a)-(b), (g); *see also Hudiberg Chevrolet, Inc.*, 199 S.W.3d at 256.

At the outset of our analysis, we note that PSI has not directed us to a portion of the record demonstrating that an objection was made to Titeflex's purported failure to segregate its attorney's fees and expense requests. PSI's counsel questioned both of

Titeflex's attorneys, Thomas A. Cowen and George E. Petersmarck, about the segregation of their attorney's fees and expenses; however, no objection was made. *See Holmes*, 115 S.W.3d at 313 (citing TEX. R. CIV. P. 274; *Solis*, 951 S.W.2d at 389; *Hruska*, 747 S.W.2d at 785; *Dieterich*, 270 S.W.3d at 705-06; *Lesikar*, 33 S.W.3d at 317); *see also Norrell*, 1 S.W.3d at 303-04. Because PSI did not object to the segregation of Titeflex's attorney's fees and expenses, we conclude that PSI's segregation contention was waived. *See Solis*, 951 S.W.2d at 389; *Dieterich*, 270 S.W.3d at 705-06; *Norrell*, 1 S.W.3d at 303-04. We now turn to PSI's sufficiency argument pertaining to Titeflex's attorney's fees and expense requests.

Section 82.002(g), which provides that a seller is entitled to recover from a manufacturer court costs, other reasonable expenses, and reasonable attorney's fees, is the procedural vehicle by which Titeflex sought to procure reasonable attorney's fees and expenses. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.002(g). "As a general rule, the party seeking to recover attorney's fees carries the burden of proof." *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10 (Tex. 1991). A determination of reasonable attorney's fees is a question for the trier of fact. *Id.* at 12. Factors that a fact-finder should consider when determining the reasonableness of a fee include: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly; (2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client;

93

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered. *See Arthur Andersen & Co. v. Perry Equip Corp.*, 945 S.W.2d 812, 818 (Tex. 1997). Evidence of each of the *Andersen* factors is not required to support an award of attorney's fees, and an attorney's fees expert "may testify that he reviewed an attorney's file and offer an opinion that the fees charged for that work were reasonable and necessary." *Dieterich*, 270 S.W.3d at 706.

Titeflex was represented by counsel from Michigan, Petersmarck, and by local counsel, Cowen. Petersmarck testified that he and his firm worked 1,032 hours on this case; and that he charged $160 per hour while his associates billed at $140 per hour. Cowen, on the other hand, noted that his firm worked 701 hours on this case; his firm's attorneys billed at $150 per hour; and his paralegals billed at $75 per hour. Petersmarck stated that the total amount of attorney's fees incurred by both firms was $382,334, and the total amount of expenses incurred was $68,519.62. Petersmarck testified that both he and Cowen had their attorney's fees audited by third parties, including Titeflex's comptroller, and the third parties concluded that the requests were appropriate and reasonable. Detailed billing statements for the work done by Petersmarck and Cowen's firms were admitted into evidence for the jury to review and evaluate. These statements reflected the nature of the services rendered, the date of service, the length of time spent on the case, applicable billing rates, and the fees and costs incurred for the services rendered. Both Cowen and Petersmarck testified that they did not charge Titeflex for all the work that was necessary to prepare to defend both PSI and Head's

lawsuits and that their hourly rates were reasonable for the locale—Hidalgo county.  PSI did not present any expert testimony to refute the attorney's fees and expenses requested by Titeflex; instead, PSI relied solely on cross-examination.  And at a pre-trial hearing, Titeflex presented uncontroverted argument that it incurred $12,393.55 in court costs; the trial court, in its discretion, ordered PSI to reimburse Titeflex for all of its court costs.

Though PSI waived its segregation contention, on cross-examination, counsel for PSI questioned Petersmarck about whether the attorney's fees requested by Titeflex were segregated between the lawsuit PSI filed against Titeflex and the lawsuit filed against Titeflex by Head.  *See Osborne v. Jauregui, Inc.*, 252 S.W.3d 70, 76 (Tex. App.–Austin 2008, pet. denied) (noting that the extent to which attorney's fees can be segregated is a mixed question of law and fact); *see also Birchfield*, 747 S.W.2d at 365 (stating that an expert may testify to ultimate issues which are mixed questions of law and fact).  To this question Petersmarck responded that he and Cowen were unable to segregate the attorney's fees because "it's all intertwined."  PSI's counsel then questioned Petersmarck about Titeflex's defense of Head's lawsuit to which Petersmarck responded that Head never submitted any discovery and any defense costs incurred in defending the Head lawsuit pertained to filing an answer to Head's petition.

Considering all of the evidence in the light most favorable to the verdict and indulging every reasonable inference from that evidence in support of the verdict, we conclude that legally sufficient evidence exists to uphold the award of attorney's fees, court costs, and expenses.  *See City of Keller*, 168 S.W.3d at 827; *see also Dieterich*,

270 S.W.3d at 706. Furthermore, in reviewing the evidence in a neutral light, we cannot conclude that the jury's attorney's fees, court costs, and expense awards were so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain*, 709 S.W.2d at 176; *see also Dieterich*, 270 S.W.3d at 706.

### 8. PSI's Entitlement to a New Trial

Finally, PSI argues that it is entitled to a new trial on Titeflex's claims because the trial court's sanctions order—striking PSI's proportionate responsibility and responsible third party defenses—deprived PSI from trying the issue of Titeflex's "innocence." We disagree.

The record does not contain any evidence indicating that Titeflex was none other than an innocent seller. PSI failed to produce the alleged faulty flex connector; the pictures admitted into evidence did not demonstrate that Titeflex had manufactured the alleged faulty flex connector; Barron was unable to produce his handwritten notes allegedly detailing that the flex connector that was removed from under fourth dispenser was manufactured by Titeflex; and Titeflex failed to present expert testimony regarding Titeflex's fault in this matter. In fact, PSI's expert, Corneilssen, failed to appear for his deposition. As a result of the dearth of evidence implicating Titeflex, both Head and PSI non-suited Titeflex. Moreover, the trial court's sanctions order did not prevent PSI from calling witnesses to refute Titeflex and Head's claims, including Head's negligence, breach of warranty, and breach of contract claims, and to establish that Titeflex was not an innocent seller within the context of sections 82.001(3) and 82.002(a). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 82.001(3), 82.002(a). In addition, we have already concluded that the trial court did not abuse its discretion in issuing its sanctions order.

Based on lack of evidence implicating Titeflex, we cannot say that PSI is entitled to a new trial to dispute Titeflex's status as an "innocent seller" under section 82.002(a). *See id.* § 82.002(a); *see also Hudiberg Chevrolet, Inc.*, 199 S.W.3d at 255 ("To escape this duty to indemnify, the indemnitor must prove the indemnitee's independent culpability."); *Ruan Leasing Co.*, 44 S.W.3d at 91 ("[I]t must be established that seller's conduct 'caused' the loss."); *The Charles Machine Works, Inc. v. Butler Rental & Sales, Inc.*, 327 S.W.3d 779, 787 (Tex. App.–Corpus Christi 2010, pet. filed) ("An inference is insufficient to establish the exception to a manufacturer's duty to indemnify; instead, to invoke the exception, a manufacturer must *prove*: (1) that the seller was independently culpable and (2) that the seller's conduct "caused the loss.") (emphasis in original). Having rejected all of PSI's contentions pertaining to Titeflex, we overrule PSI's twelfth issue.

## X. CONCLUSION

We reverse and remand for recalculation of pre-judgment interest, if necessary. We affirm the trial court's judgment in all other respects.

_____
ROGELIO VALDEZ
Chief Justice

Dissenting Memorandum Opinion by Justice Vela.

Delivered and filed the
29th day of April, 2011.

97